# Scott *v.* Scott.

Jan. 18, 1954

No. 38876          49 Adv. S. 21          69 So. 2d 489

*J. D. Stennis, Jr.,* Biloxi, for appellant.

*Merle F. Palmer,* Pascagoula, for appellee.

KYLE, J.

The appellee, Mrs. Estelle Scott, sued the appellant, Everett Scott, in the Chancery Court of Harrison County for a divorce and for the custody of their only child, Nancy Jean, five years of age. The appellee alleged in her bill of complaint as ground for divorce habitual cruel and inhuman treatment. She did not ask in her bill of complaint for alimony or suit money, nor did she ask for an allowance for the support and maintenance of the minor child, Nancy Jean. The appellant filed an answer and a cross bill, and in his cross bill asked for a divorce and for the custody of the child. He likewise alleged as ground for divorce habitual cruel and inhuman treatment. The cause was heard upon the pleadings and the proof at the March 1952 term of the court, and the appellee was granted a divorce and the custody of the minor child, subject, however, to the right of the appellant to visit the child and to have the child spend one night during each week with him. From that decree the appellant has prosecuted this appeal.

A few weeks after the divorce decree was entered, the appellant filed a petition asking that the decree be modified and that the custody of the child be awarded to him or some other suitable person to be selected by the court, because of the alleged misconduct of the appellee since the date of the rendition of the divorce decree. The chancellor heard the petition in vacation and on June 23, 1952, entered an order denying the prayer of the petition. The record of the proceedings on that petition, including the testimony of the witnesses who testified for the respective parties upon the hearing of the petition, has been made a part of the record on this appeal.

The record shows that the appellant and the appellee were married on December 13, 1944. Both parties had been married before, and both parties had been divorced from their former spouses. The appellant had five children by his first wife, but none of those children were living with him at the time of his marriage to the appellee. The appellee had been married to Andy Byrd prior to her marriage to Scott. Two children had been born of the appellee's marriage to Byrd, and both of those children were living with the appellee at the time of her marriage to Scott. Mary Alice, the older of the two children, was 11 years of age at that time, and Marie, the younger of the two children, was eight years of age. Both children continued to live with their mother after her marriage to Scott. Andy Byrd had also married again and lived in the City of Greenville until a short time before Scott and his wife separated.

Prior to his marriage to the appellee the appellant had lived on the Gulf Coast, but soon after his marriage to the appellee he and his wife and her two children moved to Pontotoc County. The appellant operated a restaurant and an ice cream parlor in the City of Pontotoc during the next two years, and then moved out on a farm which appears to have been owned by him

and his brothers. The appellant and his family lived there until December 1949 when they moved to the City of Biloxi. There they rented an apartment on Howard Avenue which they continued to occupy until the date of their separation in February 1952. The appellee's sister and her husband occupied an adjoining apartment in the same building. The appellant at the time the divorce suit was filed was employed as a maintenance and repair workman for Adrian Weill, who was the owner of rental properties in the City of Biloxi.

The evidence offered on behalf of the appellee in support of the charges made by her in her bill of complaint consisted of her own testimony and the testimony of her sister, Mrs. Mary Pierce, and her daughter, Marie Byrd.

The appellee testified that soon after her marriage to the appellant, the appellant began to nag her about her two children and that he got so he would jump on the children and knock them around and keep them crying all the time; that he showed ill manners toward her while they were in the presence of other people; and that when she proposed to him that he go his way and that she would go her way, he said, "The day you walk out of the house to leave me, that's the day I'll blow your brains out." And she stated that her husband would frequently strike her and choke her.

She stated that she had no contacts with her former husband after her marriage to the appellant until about four years before the divorce suit was filed, when Byrd had a heart attack and she and the appellant drove to Greenville with Byrd's two children to visit their father; and that she saw no more of Byrd thereafter until Byrd returned to the Gulf Coast in 1952. She stated that Byrd visited the family in the Scott apartment right after New Year's Day in 1952, and that the appellant treated him just like he had always treated him; but that after Byrd had left the apartment the appellant cursed and abused her, and would have beat her if Marie had not

intervened. She stated that the appellant a few days later took the baby, Nancy Jean, and carried her to Pontotoc County without her knowledge. After the child was brought back to their home the appellee took the child to her sister-in-law's home at Moss Point and on February 14 filed suit for a divorce. The appellee denied that she had ever done anything in the presence of her husband or out of his presence that should make him jealous of her former husband. The appellee was asked by her own attorney to tell the court about her husband striking her. "Tell the court when that occurred." Her answer was, "It has happened so many times it would be hard to call particular dates, but its happened plenty of times. His biggest game was grabbing me and choking me and slam me against the wall. That was what he enjoyed most."

On her cross-examination it appeared that most of the charges that the appellee relied upon to make out her case related to incidents that occurred while the parties were living in Pontotoc County from four to eight years before the appellee left the matrimonial domicile; and the appellee was unable to fix the time or place when the alleged acts of cruelty were committed. The appellee was interrogated especially about her charges that the appellant had jumped on the children and had mistreated them, and that he had threatened to do her bodily harm. Her testimony concerning those charges was in part as follows:

"Q. When did he start jumping on the children and beating the children?

"A. Well, we would have been married six or seven months when he jumped on the first one.

"Q. Which one?

"A. The daughter that is married today.

"Q. What did he do?

"A. He whipped her with a razor strap.

"Q. What had she done?

"A. Some foolish something in the house, I don't remember, poking around about the dish washing or something.

"Q. Do you know how hard he hit her?

"A. No, I didn't count that. I didn't count the licks. I do know that she was kind of blue a little the next day. It wasn't a unmerciful whipping, don't get me wrong, I'm not saying it was. It was a good licking. It was plenty hard, harder than you very often see.

"Q. Something to discipline the child. When was it he threatened to blow your brains out?

"A. So many times I couldn't tell you the dates, and he knows just as well as I do that I'm not sitting here lying.

"Q. Tell me when he did that the first time.

"A. We had been married about a month I guess, something like that.

"Q. And that's when he was nagging the children and you didn't like it?

"A. No, I don't like it. I wouldn't like anybody for mistreating my children.

"Q. What had the children done?

"A. Just little things—little things that nobody else would notice but him.

"Q. And he tried to correct them?

"A. He corrected them on everything they did. If they did right, it was wrong.

"Q. And you got mad and said you were going to leave him?

"A. No, I didn't get mad and say I was going to leave over correcting the children, no, but I saw well and good we wasn't going to get along.

"Q. That was eight years ago?

"A. Yes."

The appellee was later asked for more details concerning other charges made by her on her direct examination:

"Q. When was it that Scott struck you and choked you and slammed you against the wall?

"A. A dozen times.

"Q. When?

"A. One time in Pontotoc after the baby was just small. He done me like that (indicating). He jerked me and slammed me against the wall. Daughter tried to pull him off and he turned on the daughter and I had to send after his brother, Howard, in the witness room there now, to straighten him out. And when his brother got there he denied every bit of it.

"Q. Nobody has ever seen him strike you or Marie except you or Marie?

"A. My sister has seen him choking me. He's not going to get in front of my family and jump on me, that wouldn't be sensible.

"Q. Nobody has ever seen him do those things but you and Marie?

"A. And Mary Alice, my other daughter."

Finally, the appellee was asked on cross-examination when it was that she claimed that the appellant jumped on her because she had entertained Andy Byrd and would have beat her if her daughter, Marie, had not interfered; and her answer was, "That was just before we left from there."

Mrs. Mary Pierce, the appellant's sister, testified that she lived with the appellant and the appellee in 1945 and 1946, while they were living at Pontotoc, and that "They got along nicely for a while, but there was one time they was very much in a uproar." The witness stated that she saw the appellant choke the appellee, and that there were finger marks on her neck. On cross-examination she stated that the incident mentioned by her occurred in 1945. Mrs. Pierce was then asked the following questions and made the following answers:

"Q. Well, you have lived right next door to them for about seven months?

"A. Since I have been down here, that is right.

"Q. And you haven't seen him choking her or mistreat her?

"A. I sure haven't.

"Q. Hasn't he worked hard and provided well for her and the family?

"A. He has.

"Q. And for her children by her former husband?

"A. That is right.

"Q. And he provided for the one that is with her now even more than he did for the one that is married, didn't he?

"A. He was good to her, that is right.

"Q. Would you say that that child is become a spoiled child for having her way about things and getting whatever she wanted?

"A. Well, she is rather spoiled."

Marie Byrd testified that the appellant was jealous of his wife, and was always cursing and pushing her around, and that any time he would get mad he would grab her and shake her. She stated that on one occasion, while they were living in Pontotoc about four years before the date of the trial, the appellant and the appellee were fussing about something, and that the appellant shoved the appellee against the dish cabinet, and that she ran in between them, and that her mother told her to go for Howard, the appellant's brother who lived close by; and she went down and got Howard. Marie also stated that since the family had been living in Biloxi, the appellant would grab her mother and shake her at any time that he got mad. But, when she was pressed by the appellant's attorney to give the dates when such incidents occurred, she admitted that no such incidents had occurred since they had been living in Biloxi.

The appellant, Everett Scott, testifying in his own behalf, denied that he had ever been guilty of any acts of cruelty toward his wife; and he denied the appellee's charges that he had constantly found fault with her and the children, or that he had ever been unkind to her or the children. He stated that the first few years of their married life had been congenial, and that he had provided for his wife and her two children to the best of his ability. The money that he had earned had been spent for the support of his family, including his two stepchildren. He had paid tuition for Marie to go to school in Ocean Springs during the preceding year and during the year when the divorce case was tried. The appellant denied that he had ever struck his wife or that he had ever choked her, or that he had ever tortured her in any way, as alleged in her bill of complaint.

The appellant stated that there was no serious discord of any kind in the family during the first years of their married life; and it was only after he and his wife had made a trip to Greenville with Byrd's two daughters about four years before the date of the trial to enable the children to visit their father who was seriously ill at that time that he was made to feel that the family relations were becoming somewhat strained. No serious breach occurred, however, until after Marie's visit to her father during the Christmas Holidays in December, 1951, and Byrd's return to the Gulf Coast at the beginning of the New Year. Marie wanted to visit her father in Greenville during the holidays, and the appellant gave her $24 to finish paying for a coat that she had bought on a lay-away plan so that she might wear it on the trip to Greenville; and the appellant gave her $10 to defray the expense of her return trip. Marie made the visit to her father, and when she returned to Biloxi at the end of the holiday season, Byrd came with her, and Byrd went to the Scott apartment to visit his daughters. The appellant stated that he invited him in and visited with him

until he was ready to leave. Byrd came back about two weeks later and was again cordially received. Byrd did not return to Greenville, but got a job in Pascagoula and remained on the Gulf Coast. In the meantime Marie let it be known that her father and his second wife had separated. The appellant stated that he soon became suspicious of his wife's attentions to her former husband. Discord developed in the Scott family and during the latter part of January the appellant took the baby, Nancy Jean, and carried her to Pontotoc. But a few days later the appellant and his wife and her sister went to Pontotoc to get the child. When they got back to the home after night, they found Byrd lying on a cot in the Pierce apartment apparently drunk. The Pierce apartment immediately adjoined the apartment occupied by the appellant and his family. The appellant stated that when he saw Byrd lying on the cot he got his pistol and told Marie to get him out of the house. Marie did get her father out of the house. The appellant stated that was the only time that he ever threatened to use a pistol. He said he told his wife that she should not bring Byrd back to the apartment, and that if she did there would be trouble.

The appellant testified that his wife finally let it be known that she wanted a divorce. The appellant stated that he then offered to move out of the apartment, and to pay the rent, and to furnish food, light and other things necessary, if she would only stay there and take care of the baby. He told her that he would get a room elsewhere, and would not bother her except to come to see the baby. But the appellee would not agree to that. The appellant stated that his wife left him on February 13, and that he received immediately thereafter a summons in the divorce suit. The appellant stated that his wife did not drink, and that she did not go to honky tonks, and that he did not actually know of any improper relations between her and her former husband.

Otho Pierce, whose wife was the appellee's sister, testified that he and his wife had lived in an apartment immediately adjoining the Scott apartment for a period of several months immediately preceding the date of the separation. He was asked how long he had known that trouble was brewing between Scott and his wife regarding Andy Byrd, and his answer was, "about two months." It dated back to the time when Marie went to see Byrd, and Byrd brought her back to Biloxi. Pierce testified that Marie had admitted in her mother's presence that she had carried notes between Byrd and her mother. Pierce stated that he never knew of the appellant either striking or choking the appellee or abusing her in any way, and that he thought that if the appellant had mistreated the appellee in any way he would have heard something about it. He knew of no trouble between them other than Andy Byrd. He stated that the appellant had provided for his family, and that no one had anything to do with pulling the appellant and his wife apart except Marie and Andy Byrd.

E. Z. Davis, the appellee's father, testified that he had visited in the Scott home for several weeks at a time, and that Scott had provided for his wife and had been a good husband to her, and had been good to her children. He stated that Scott was not an able man, but that he had worked hard and had made good money while he was working, and that his family had got the benefit of it. Davis stated that he had not heard of any trouble between Scott and his wife until after Byrd came back to the Gulf Coast. He stated that Byrd had never helped take care of his two children, and that Scott had helped their mother raise them.

Howard Scott, the appellant's brother, testified that he lived at Pontotoc, and that on one occasion while the appellant and his wife were living in Pontotoc he had been called to the appellant's home to settle a fuss between the appellant and Mary Alice, one of the appel-

lant's stepdaughters. That was shortly after the appellant and the appellee were married. He had never known of any serious trouble between them until recently.

██ We have made a most painstaking and thorough examination of the whole record; and we think that the plaintiff has failed to establish her right to a divorce. The specific acts of cruelty testified to by her and her sister-in-law and her daughter were acts alleged to have been committed several years before the parties separated. The appellee's sister testified to only one specific incident tending to show cruel and inhuman treatment, accompanied by personal violence, of which she had any personal knowledge, and according to her testimony that incident occurred in 1945. Marie testified to only one such specific incident, and according to her testimony that incident occurred about four years before the date of the trial while the parties were living in Pontotoc County. If those incidents occurred, as testified to by the witnesses, the injuries inflicted were not of such serious nature as to bring about a rupture of the marriage relationship at that time. The appellee continued to live with the appellant, and neither the appellee nor any of her witnesses testified that any such acts of cruelty or unkindness occurred at any time after the family moved to Biloxi in December 1949 and prior to Andy Byrd's return to the Gulf Coast at the beginning of the year 1952. If the appellant had been guilty of any acts of cruelty during the time the parties were living in Pontotoc, such acts had been condoned by the appellee; and there is no proof in the record to indicate that such acts were repeated or that such cruelty was continued after the parties moved to Biloxi in December 1949.

We have not undertaken to set out in detail all of the testimony relating to the events that took place during the few weeks that elapsed between New Year's Day in 1952 and the date of the final separation; but from the testimony as a whole it appears that the rupture that

occurred between the appellee and her husband during that time was largely due to the appellee's own conduct and attitude.

■■■ It is only in rare cases that this Court will reverse a chancellor upon a disputed question of fact. But when the chancellor's decision in a divorce case appears to be manifestly wrong this Court has not hesitated to reverse the decree of the chancellor. Ammons v. Ammons, 144 Miss. 314, 109 So. 795; Russell v. Russell, 157 Miss. 425, 128 So. 270; Long v. Long, 160 Miss. 492, 135 So. 204; Price v. Price, 181 Miss. 539, 179 So. 855; Stringer v. Stringer, 209 Miss. 326, 46 So. 2d 791; Chambers v. Chambers, 213 Miss. 71, 56 So. 2d 33.

In the case of Russell v. Russell, 157 Miss. 425, 128 So. 270, the Court said: "Cruel and inhuman treatment, unaccompanied by personal violence, within the meaning of the statute, is such conduct only as endangers life, limb or health, or creates a reasonable apprehension of danger thereto, thereby rendering the continuance of the marital relations unsafe for the unoffending spouse, or such unnatural and infamous conduct as would make the marital relation revolting to the unoffending spouse and render it impossible for him or her, as the case may be, to discharge the duties thereof, thus defeating the whole purpose of that relation. Crutcher v. Crutcher, 86 Miss. 231, 38 So. 337; Humber v. Humber, 109 Miss. 216, 68 So. 161; McNeill v. McNeill, 125 Miss. 277, 87 So. 645; 19 C. J. 44."

In the case of Ammons v. Ammons, 144 Miss. 314, 109 So. 795, the Court held that, in a divorce case, where cruelty is relied upon as a ground for divorce, the complainant will not be entitled to a divorce if she provoked the acts constituting the alleged cruelty by her own conduct.

The appellant does not argue on this appeal that the chancellor erred in refusing to grant him a divorce on his cross bill. But the appellant does contend that the

chancellor erred in granting a divorce to the appellee and in awarding to the appellee the custody of the minor child, Nancy Jean.

We think that the decree granting a divorce to the appellee should be reversed; but we do not think that the part of the decree which provides that the appellee shall have the custody of the child Nancy Jean should be disturbed by us. The chancery court has a broad discretion in determining the issue of custody of a child. Neither the father nor the mother has any paramount right over the other concerning the custody of a minor, where such custody would not adversely affect the child's welfare. Section 399, Code of 1942. The paramount consideration is the welfare of the child, and, as well stated in Amis, Divorce and Separation in Mississippi (1935), Section 219, p. 296, "In all cases where any child is of such tender age as to require the mother's care for its physical welfare it should be awarded to her custody, at least until it reaches that age and maturity where it can be equally well cared for by other persons." See Boswell v. Pope, 213 Miss. 31, 56 So. 2d 1, and cases cited.

The chancellor had jurisdiction to decree the custody of the child even though the appellee's petition for a divorce should have been denied. Davis v. Davis, 194 Miss. 343, 12 So. 2d 435.

In view of what has been said above, the decree of the lower court granting a divorce to the appellee will be reversed, and a decree will be entered here dismissing the bill of complaint insofar as it relates to the granting of a divorce. But that part of the decree of the lower court awarding the custody of the minor child, Nancy Jean, to the appellee will be affirmed, subject to the right of the chancellor, however, at any time to make such change in the decree relating to the custody of said minor child as he may deem proper, having in view the welfare and best interest of the child.

■■■ The appellee has filed a cross-assignment of errors in which she has alleged that the chancellor erred in refusing to allow to her alimony and suit money, and in failing to make a proper allowance for the support and maintenance of the child. But the appellee did not ask in her bill of complaint for the allowance of alimony or suit money, nor did she ask for an allowance for the support and maintenance of the child. And no application was filed in the lower court during the progress of the suit for the allowance of alimony or suit money, or for an allowance for the support and maintenance of the child. The decree of the lower court will therefore be affirmed on the appellee's cross appeal, without prejudice, however, to the right of the court below, upon proper application therefor, to make such orders hereafter as may be necessary for the support and maintenance of said minor child.

The appellee has filed a motion in this Court asking for the allowance of a reasonable attorney's fee, to be paid to her attorney for legal services rendered by him on this appeal. We think that there is sufficient evidence in the record to justify the allowance of such fee, and that motion will be sustained; and the sum of $100 will be allowed to the appellee for the payment of such attorney's fee, the amount thus allowed to be paid by the appellant to the clerk of the lower court, subject to the appellee's order, within thirty days from the date of the filing of the mandate of this Court with the clerk of the court below.

Reversed in part on direct appeal and judgment rendered for the appellant, and affirmed in part and remanded; and affirmed on cross-appeal.

*McGehee, C. J.,* and *Hall, Arrington* and *Ethridge, JJ.,* concur.