# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-CP-00828-SCT

*MICHAEL T. GERTY AND STATE OF MISSISSIPPI EX REL. JIM HOOD, ATTORNEY GENERAL*

*v.*

*JOESIE R. GERTY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/08/2017 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| TRIAL COURT ATTORNEYS: | JUSTIN L. MATHENY |
| | ANNA WARD SUKMANN |
| | M. CHANNING POWELL |
| | THOMAS WRIGHT TEEL |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL T. GERTY (PRO SE) |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUSTIN L. MATHENY |
| ATTORNEY FOR APPELLEE: | M. CHANNING POWELL |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 12/13/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND ISHEE, JJ.**

**RANDOLPH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     In September 2013, the Gertys filed a joint complaint for an irreconcilable-differences divorce. The joint complaint languished in the Harrison County Chancery Court for almost two years, during which the parties cooperated with each other and faithfully abided by the Property Settlement Agreement ("PSA"), which had been filed contemporaneously with the joint complaint. The PSA provided that Michael would have physical custody of the couple's

minor child. Joesie had full knowledge that Michael was required to move to the Great Lakes area to fulfill a three-year military commitment when she agreed that their son would move with Michael. Joesie made the decision not to move to the Great Lakes area with their son and Michael. By her own admission, her decision was due to Michael's lack of intimacy and her desire to live as a single woman.[1] It was Joesie's idea that their son and Michael move in with a military family in the Great Lakes area that Joesie knew from the Mississippi coast.

¶2. During this same time, without his knowing her connection, Joesie had Michael assist her in moving her belongings into the house of her paramour's mother, Robin Caldwell Fitzgerald.[2] For nearly two years, Michael and their son lived apart from Joesie. She chose to spend Thanksgiving of 2013 and 2014 and Christmas of 2012 and 2013 with Kyle and his family, unknown to Michael. The sexual nature of her affair with Kyle ended in January 2014 or May 2014, depending upon what testimony from Joesie is to be accepted. She further admitted that she continued to engage socially with Kyle until December 2014, unknown to Michael.

¶3. In January of 2015, Michael informed Joesie that reconciliation was impossible and that he wanted her to sign and finalize the divorce papers. Joesie, upon the advice of her

---

[1] Testimony revealed that at the time of trial Joesie was thirty-seven, Michael was forty-two, and Kyle Rebstock, with whom Joesie admitted having an affair, was twenty-eight.

[2] Kyle was a student at the University of Southern Mississippi in Hattiesburg, Mississippi.

attorney,[3] surreptitiously told Michael that she also was ready to complete the irreconcilable-differences divorce. Based on the advice of her counsel, Joesie waited until her summer visitation had begun pursuant to the PSA and until her son was physically in Mississippi before withdrawing her consent to an irreconcilable-differences divorce. Joesie and Michael then filed separate complaints for divorce on the ground of adultery, *inter alia*, and alternatively sought an irreconcilable-differences divorce.

¶4.    After a temporary hearing on July 13, 2015, the chancellor granted physical custody to Joesie. The trial began in December 2015[4] and concluded May 2016. Six months later, in November 2016, the chancellor entered a final judgment and decreed that a divorce should be granted, but that neither party was entitled to a fault-based divorce. She found that Joesie had failed to establish adultery. She found that Michael had proved adultery because Joesie had admitted it, but that Michael had condoned Joesie's adulterous conduct. Then the chancellor *sua sponte* declared the statutory scheme under Mississippi Code Section 93-5-2 (Rev. 2013) unconstitutional and granted an irreconcilable-differences divorce. Joesie was granted custody of their child.

¶5.    Today's case, as described by the State, is unique but not unprecedented—Michael, Joesie, and the State agree that the chancellor erred in declaring Section 93-5-2

---

[3] M. Channing Powell.

[4] The chancellor did not reference any testimony adduced during the two days devoted to trial in December 2015 in the procedural-history section of either the final or the amended final judgment of divorce.

unconstitutional.[5] After the chancellor's November 15, 2016, final judgment was entered, Michael and Joesie, along with the State of Mississippi, asked the chancellor to reconsider her judgment,[6] because no party had asked for, pleaded, argued, or offered proof on the unconstitutionality of the statute. The chancellor gave the parties and the State an opportunity to brief the constitutionality of Section 93-5-2. In the arguments for reconsideration, all parties conceded that the chancellor had erred in granting an irreconcilable-differences divorce. No other hearings were conducted. Yet the chancellor significantly amended her earlier final judgment,[7] increasing Joesie's award to include a percent of Michael's military-retirement benefit and reducing the noncustodial parent's summer visitation from three months, as provided in the PSA, to one month, contrary to the PSA and the chancellor's original final judgment.

¶6.    The State appealed the chancellor's *sua sponte* adjudication of Section 93-5-2 as unconstitutional. Michael also appealed, arguing that the trial court erred by (1) declaring

---

[5] An amicus brief was filed by the Mississippi Coalition Against Domestic Violence in support of the chancellor's finding. The amicus called for affirming the chancellor, because the statute deprived domestic-abuse victims of constitutional rights. However, no domestic violence was pleaded or proved in this matter.

[6] Michael filed his Motion for Reconsideration of Court's Judgment Under M.R.C.P. 59 and 60 on November 22, 2016. Joesie filed her Motion to Reconsider Final Judgment of Divorce on November 23, 2016. The State filed its Motion to Alter or Amend, or for other relief from the "Final Judgment of Divorce and Notice of Unconstitutionality of Section 93-5-2 of Mississippi Code of 1972, as Amended," on December 6, 2016.

[7] In the amended judgment, the chancellor acknowledged "procedural irregularities," but she opined that such errors had been harmless.

Section 93-5-2 unconstitutional, (2) failing to award Michael a divorce on the ground of adultery, (3) reducing Michael's summer visitation, (4) awarding Joesie a portion of Michael's retirement benefits, and (5) awarding custody to Joesie. We affirm the chancellor's finding regarding custody and child support, but we reverse the remaining judgment and remand the case for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

¶7. On September 18, 2013, Joesie[8] and Michael Gerty filed a Joint Complaint for Divorce (Irreconcilable Differences), which Joesie admitted was precipitated by her self-described summer 2013 "fling" with Kyle and her desire to be a single woman. After numerous revisions, concessions and negotiations, Joesie and Michael executed and filed as an exhibit to their complaint for divorce a Separation and Child Custody and Property Settlement Agreement, which provided that their minor son[9] would live with Michael during the school year and with Joesie during the summer. The following clause was included in the PSA:

> It is agreed and understood that this Agreement is not contingent upon a divorce [sic] being granted. However, if the parties are granted a divorce on any grounds, the parties agree that this Agreement shall be made a part of the Judgment and that such Judgment shall not conflict with the terms of the Agreement [sic] except to the extent disapproved by the Court [sic] the [sic]

[8] Joesie and Michael married on May 7, 2005. Prior to her marriage to Michael, Joesie was married to Jerry Smith, who was granted a divorce on the ground of adultery and custody of their two minor children in March 2005. In that prior proceeding, Joesie was represented by her present counsel, Channing Powell.

[9] The minor child was born on December 1, 2006.

parties agree that each mutually submits to the personal jurisdiction of the Chancery Court of Harrison County, State of Mississippi, so that said Court has the power to decide any and all matters and questions concerning the dissolution of the parties' marriage . . . and the division of the parties' property and debts.

¶8. Neither party sought to finalize the divorce or to change the PSA for nearly two years. At the same time, with Joesie's participation and agreement, the minor child moved to Wisconsin and later to Illinois pursuant to the PSA. Joesie visited sparingly, with Michael paying all her travel expenses. The minor child also traveled with his mother at Michael's expense to reside with Joesie during the summers.

¶9. Joesie admitted to deceiving Michael in May 2015 by telling him that she would agree to finalize the divorce papers. Two weeks later, Joesie picked up their then eight-and-one-half-year-old son and brought him back to Mississippi, ostensibly for the agreed-upon summer-visitation period. On June 10, 2015, Joesie withdrew her consent to the pending irreconcilable-differences complaint. She alleged that the best interest of the minor child required that she have physical custody. One week later, Joesie filed a separate complaint for divorce, pleading adultery, habitual cruel and inhuman treatment, and desertion as grounds. Alternatively, Joesie sought a divorce based on irreconcilable differences. To support her claim for custody, Joesie falsely pleaded in the complaint that their son had resided with her in Pass Christian since January 2014.[10] Joesie also filed a motion for temporary relief,

---

[10] During the trial, Joesie confessed that her statements regarding where their son had lived at the time she filed her complaint were not true. Joesie testified that when she decided to fight for custody, she was informed by her attorney that she should wait until her son was

6

requesting temporary custody, an increase in child support, exclusive use of the marital home (which she already had under the PSA), exclusive rights to all of Michael's accounts (including his military retirement), and an increase in alimony until the final hearing on her complaint for divorce.

¶10.    Michael answered her complaint, asserting that both he and Joesie had been abiding by the 2013 PSA for nearly two years and that the PSA should be given full force and effect. Michael also pleaded that Joesie "mislead[] the court in a fraudulent manner" regarding the residence of their son. Michael averred that he and his son had lived in the Great Lakes area for six months since December 2014 and that, before that, they had lived in Wisconsin from September 2013 through December 2014. Michael pleaded that he had been the primary parent to their son and that he should be awarded custody and support.

¶11.    Michael included in his answer a separate countercomplaint, alleging that the parties had agreed to a divorce and had agreed that Michael would have custody of their son. Michael asked the court to ratify the PSA, at least on a temporary basis, and to return the child to the temporary custody of Michael.

¶12.    Joesie responded to Michael's countercomplaint for divorce by admitting adultery but by affirmatively pleading condonation by Michael. Joesie asked the chancellor to dismiss Michael's countercomplaint.

physically living with her in Mississippi before she sought custody.

¶13. On July 13, 2015, after a temporary-custody hearing, the chancellor awarded temporary custody of the child to Joesie and awarded child support. The chancellor also ordered spousal support and exclusive use and possession of the marital home as provided by the PSA.

¶14. A five-day trial began in December 2015 and was completed in May 2016.[11] Six witnesses testified and twenty-eight exhibits consisting of hundreds of pages of documents were entered into evidence.

¶15. Joesie admitted that the factor precipitating the filing of the joint complaint and the PSA was Michael's August 2013 discovery of and Joesie's admission to her 2013 summer "fling" with Kyle. Joesie told Michael that her "fling" had ended. At the time Michael found out about her "fling," he had already received orders to be stationed in the Great Lakes area. Michael testified that Joesie decided that "she would be much happier if she stayed [on the Mississippi coast] and [if Michael and their son] moved up to the Great Lakes area without her." Michael further testified that he drafted the joint complaint, and both agreed on all terms of the PSA.

¶16. The day before Michael and their son moved, Michael helped Joesie move from base housing to the home of her paramour's mother. In fact, Michael was not aware of Fitzgerald's relationship to Kyle until he began preparing for trial. Joesie admitted that she

---

[11] In addition to hearing testimony at the temporary-custody hearing on July 13, 2015, the chancellor heard live testimony on December 7 and 9, 2015, and May 2 through May 4, 2016.

8

never revealed to Michael that Fitzgerald was Kyle's mother. Joesie accompanied Michael and their son to the Great Lakes area to help them get settled. She was present for their son's first day of school. Joesie recommended that they move in with Amy Malatag[12] and her then-husband, Joe Dunka, so that Amy could help take care of their son.

¶17. Testimony and evidence presented by Joesie and her witnesses at both the temporary hearing and the trial reveal that her affair with Kyle started before the summer of 2013 and continued into 2014. She admits that she only disclosed to Michael her summer 2013 "fling." During the temporary hearing, Marion Haffner, Joesie's best friend, testified that Kyle was a friend of her boyfriend's. Haffner testified that she and her boyfriend double dated with Joesie and Kyle. Joesie admitted that after Michael and their son moved in September 2013, Joesie, Kyle, Haffner, and Haffner's boyfriend spent the night at Haffner's boyfriend's condo in Gulf Shores, Alabama.[13] Joesie also testified that she underwent a tubal ligation during their separation after Michael moved to the Great Lakes area, because she was not "intentionally planning on hav[ing] another kid."[14]

---

[12] Amy was a close friend of Joesie's, a fellow Seabee wife, and belonged to the same Filipino community when she previously had lived on the Mississippi coast. Amy and Joesie communicated through Facebook in their Filipino dialect, and Amy provided a translation of those communications to Michael prior to trial.

[13] Haffner testified that this trip occurred after the summer of 2013, while the Gertys' son was living with Michael.

[14] Michael testified that he previously underwent a vasectomy.

¶18. The trial began in December 2015.[15] Joesie called her best friend Haffner as a witness. Haffner testified that she was aware that Joesie had dated other men besides Kyle. She also testified that Joesie had been in a relationship with Kyle beginning in 2011 and continuing through the time of her testimony. Haffner testified that she was aware that Joesie and Kyle still socialized together. Haffner admitted that she was aware that Joesie exposed her own daughter Joy (from her first marriage) to her adulterous relationship with Kyle. Haffner was shown numerous pictures, some taken by her, depicting Joesie, Kyle, Joy, her, and others together. The pictures of Joesie and Kyle showed them embracing or otherwise exhibiting affection, one to the other. Haffner identified a picture of Joesie with a dog and testified that Kyle had given her the dog as a gift. Haffner testified that to her knowledge Michael did not know that Joesie continued to see Kyle after she confessed to a summer romance. Haffner testified that she discouraged Joesie from having the affair with Kyle and encouraged her to be honest with Michael.

¶19. Joesie testified that after she informed Michael about her summer 2013 "fling," she continued to communicate through social media and text messaging and to see Kyle because "[w]e stayed friends. They—his family loves me, so they invite me if there is a get-together at their house." She spent numerous holidays, including Thanksgiving in 2013 and 2014 and Christmas in 2012 and 2013, with Kyle and his family away from Michael and their son.

---

[15] Again, testimony adduced during the first two days of trial, December 7 and 9, 2015, including the testimony provided by Joesie's best friend Haffner, was not referenced in either of the chancellor's final judgments.

Joesie was shown numerous screenshots from Facebook demonstrating that she had continued to comment on pictures and other posts on Kyle's page. Joesie testified that she was still seeing Kyle, having a sexual relationship with him, texting him when she was visiting Michael and their son, and commenting on Kyle's Facebook posts while she was attempting to reconcile with Michael.

¶20. When the trial resumed in May 2016, Joesie testified that, in addition to her beach vacation, she also went to Bellingrath Gardens with Kyle and others. She testified that she went out drinking and dancing with Kyle and other friends numerous times. All of these outings occurred when their son was living with Michael. She admitted that she never revealed to Michael that she was still seeing Kyle during the fall of 2013 into 2014 and that she never sought his forgiveness for or condonation of her multiple acts of adultery.

¶21. Amy Malatag, who has known Joesie since 2009, was also called to testify during the trial telephonically. She testified that she communicated with Joesie on Facebook in their shared Filipino dialect prior to Michael's moving to the Great Lakes area. Joesie had confessed to Amy that she was dating someone in the military.[16] When Joesie helped Michael move in with Joe and Amy, Amy questioned Joesie about why she was not moving with them.

---

[16] Joesie never claimed that she confessed to Michael that she had had an affair with a person in the military. Kyle was not in the military but rather was a student at the University of Southern Mississippi in Hattiesburg.

11

And she said that she wants to live single. And then she started that night, we were in the garage, she was telling me about her boyfriend. I think that was Kyle. And then she called him on the phone, and then I was there. She was talking to him, and they were saying "I love you."

Amy testified that she did not understand why Joesie would abandon her child for another man.

¶22. Numerous exhibits were admitted showing that Joesie remained in regular contact with Kyle. They continued to text each other, to communicate over Facebook, to attend the same parties, and to take overnight trips together.

¶23. Michael testified that he attempted to reconcile with Joesie after she confessed that she had a summer "fling" in 2013, and that she told him that it had ended. He believed that Joesie also had wanted to reconcile until they took a family vacation to California in December 2014. However, in January 2015, Michael learned that Joesie had not been honest with him about the expansive nature of her relationship with Kyle. She admitted at trial that she had continued to communicate with Kyle, even during the trip to California in December 2014. Realizing that Joesie had not been truthful or contrite, Michael determined that their marriage could not be saved. He informed Joesie that reconciliation was not possible and that she needed to sign and finalize the pending divorce complaint.

¶24. On November 15, 2016, the chancellor entered a judgment of divorce styled "Final Judgment of Divorce and Notice of Unconstitutionality of Section 93-5-2 of the Mississippi Code of 1972, as amended." The chancellor concluded that neither party had proved a statutory basis for divorce. The chancellor found that (1) Joesie had failed to establish that

12

Michael was absent for a period of one year without her consent and that he intended to abandon the marriage; (2) neither party had proved habitual cruel and inhuman treatment as required by law; (3) Joesie had failed to establish that Michael committed uncondoned adultery; and finally, (4) Michael had condoned all of Joesie's adultery. Given these conclusions, the chancellor declined to grant either party a fault-based divorce.

¶25.    Finding that neither party had proved grounds but that declaratory relief should be granted, the chancellor *sua sponte* declared that "the present Mississippi statutory fault-based divorce scheme . . . unconstitutionally restricts and, in some cases, denies [a host of] fundamental rights and freedoms. . . ." The chancellor specifically held that irreconcilable differences requiring mutual consent of couples to divorce was unconstitutional. No notice was provided until after entry of the chancellor's November 15, 2016, judgment. The chancellor acknowledged that, although "the parties did not execute a formal consent for the Court to adjudicate contested matters on this basis . . . , [t]he parties are constitutionally entitled to a divorce without the mutual consent of the other."

¶26.    The chancellor also found that the PSA was binding on the parties and that it remained in full force and effect, with the exception of the child-custody and child-support provisions as modified by the chancellor. After conducting an *Albright*[17] analysis, the chancellor found that the best interests of the child supported his remaining in Joesie's custody, with liberal visitation granted to Michael. Michael was ordered to pay $764 per month in child support.

---

[17] *Albright v. Albright*, 347 So. 2d 1003 (Miss. 1983).

13

¶27.    Michael moved that the court reconsider its judgment, arguing that neither party had pleaded that the irreconcilable-differences statute was unconstitutional and that the Attorney General had not been timely noticed of the attack upon the constitutionality of the statute prior to the chancellor's ruling. In the alternative, Michael argued that (1) the entire PSA was valid; (2) the chancellor used the wrong standard in granting custody to Joesie, since the PSA was valid; and (3) Joesie did not prove condonation. Michael urged the chancellor to grant full relief pursuant to the PSA and to grant the parties an irreconcilable-differences divorce or to grant Michael a divorce on the ground of adultery.

¶28.    Joesie also filed a motion to reconsider the final judgment, and her counsel argued at the hearing that

> I read what the Attorney General wrote and the cases cited there, and I agree with the Attorney General in that issue, in that while some statutes may be unconstitutional, nobody asked this Court to determine that that was unconstitutional. So I would ask the Court to set aside that aspect of this judgment. When it sets aside that aspect of this judgment, however, then what we're left with is the rest of the judgment cannot stand.

Joesie is now precluded from taking a different position than what she argued before the chancellor. Joesie also argued that the chancellor erred in failing to award her benefits related to Michael's military retirement and erred in failing to consider that Michael was the sole owner of the marital home. Joesie also moved the chancellor to reconsider the grant of an irreconcilable-differences divorce because Joesie had litigated the divorce on other grounds.

¶29.    After receiving post-judgment notice, the State of Mississippi moved to alter or amend the chancellor's judgment, acknowledging that all parties agreed with the State's argument

14

that no constitutional challenge had been made by any party. First, the State argued that if the chancellor could grant a divorce on other grounds, the chancellor should "avoid wading into any constitutional issues associated with the ID divorce statute." Second, the State argued that the notice procedure of Rule 24 of the Mississippi Rules of Civil Procedure had not been followed and that the chancellor had erroneously cited Rule 19 of the Mississippi Rules of Civil Procedure, which allows additional parties to be added but does not permit the addition of claims never pleaded by any party. Finally, the State argued that neither party had pleaded or asserted that any portion of the statute was unconstitutional. It continued that a trial court could not *sua sponte* adjudicate constitutional issues.

¶30.    Three months later, on June 8, 2017, the chancellor denied Michael's and the State's motions and granted Joesie's motion in part. The chancellor found that the PSA was silent about Michael's military retirement. "The court finds the [PSA] is at least ambiguous with regard to the division of Michael's military retirement . . . but also to the division of Joesie's 401k retirement plan." The chancellor awarded Joesie 22 percent of Michael's retirement (which was half of the marital portion) and 100 percent of her own 401(k) retirement plan valued at approximately $23,000. The chancellor did not make a specific award as to Joesie's retirement. Joesie also was awarded exclusive use of the marital home. In addition to every other weekend and alternating holidays, Michael was granted only one month of visitation each summer.

**ISSUES**

15

¶31. First and most importantly, the State and both parties aver that the trial court erred by *sua sponte* raising the issue of the constitutionality of Section 93-5-2 and, further, by declaring the statute unconstitutional, thus granting unrequested declaratory relief in the form of an irreconcilable-differences divorce. We agree.

¶32. Michael additionally raises issues regarding Joesie's condonation affirmative defense, visitation, amendment of the PSA, and custody. We agree that the trial court erred in ruling that Michael had condoned Joesie's adultery, apart from the "fling" in the summer of 2013, and in declining to grant Michael a divorce on the ground of adultery. Because a fault-based divorce should have been granted to Michael and because fault is a factor to be considered in alimony, we remand this matter for the chancellor to reconsider alimony, because Joesie's adultery precipitated this divorce. The chancellor is also instructed to revisit visitation and the division of marital assets in light of this opinion.

## STANDARD OF REVIEW

¶33. "We employ a limited standard of review in domestic relations cases." *In re Dissolution of Marriage of Wood*, 35 So. 3d 507, 512 (Miss. 2010). Generally, "[t]his Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused [his or her] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Id.* (quoting *Duncan v. Duncan*, 774 So. 2d 418, 419 (Miss. 2000)). However, "[w]hile a chancellor's decisions in a divorce action are reviewed for manifest error, a property settlement agreement is a contract, and contract interpretation

16

is a question of law, which is reviewed *de novo.*" ***McFarland v. McFarland***, 105 So. 3d 1111, 1118 (Miss. 2013) (citing ***Harris v. Harris***, 988 So. 2d 376, 378 (Miss. 2008)). All other questions of law also are reviewed *de novo,* and the reviewing court "will reverse if the law has been applied or interpreted erroneously." ***Martin v. Lowery***, 912 So. 2d 461, 464 (Miss. 2005) (citing ***Miss. Transp. Comm'n v. Fires***, 693 So. 2d 917, 920 (Miss. 1997)).

## ANALYSIS

### I.   Constitutionality

¶34.   Few subjects in our jurisprudence are so settled as the maxim that a statute's constitutionality will not be considered unless it has been specifically pleaded. *See **Martin***, 912 So. 2d at 464-65;  ***Lawrence Cty. Sch. Dist. v. Bowden***, 912 So. 2d 898,  900 (Miss. 2005); ***City of Jackson v. Lakeland Lounge of Jackson, Inc.***, 688 So. 2d 742, 749 (Miss. 1996) (citing ***State ex rel. Carr v. Cabana Terrace, Inc.***, 247 Miss. 26, 153 So. 2d 257, 260 (1963)); *see also **Colburn v. State***, 431 So. 2d 1111, 1114 (Miss. 1983); ***Witt v. Mitchell***, 437 So. 2d 63, 66 (Miss. 1983)."[I]issues are framed, formed and bounded by the pleadings of the litigants. The Court is limited to the issues raised in the pleadings and proof contained in the record." ***Lakeland Lounge***, 688 So. 2d at 750 (emphasis removed) (internal citation omitted). A trial court may not raise a constitutional issue *sua sponte*. ***In re Estate of Miller v. Miller***, 409 So. 2d 715, 718 (Miss. 1982).

¶35.   The chancellor fully acknowledges that the litigants did not raise the constitutionality of Section 93-5-2 in their pleadings or proof. The chancellor's ruling, that the statutory

17

scheme presented by Section 93-5-2 is unconstitutional, exceeded her authority. The rule of law requires that we reverse and vacate the chancellor's judgment declaring the statute unconstitutional and granting an irreconcilable-differences divorce.

## II. Condonation

¶36. "In Mississippi one seeking a divorce on the grounds of adulterous activity must show by clear and convincing evidence both an adulterous inclination and a reasonable opportunity to satisfy that inclination." *Holden v. Frasher-Holden*, 680 So. 2d 795, 798 (Miss. 1996) (internal citations omitted). "Adultery may be shown by evidence or admissions[,] and either [is] sufficient to support a decree of divorce. *Id.* at 799 (internal citations omitted). Furthermore, in cases concerning an allegation of adultery, the chancellor is required to make a finding of fact. *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986). "Where chancellors make such findings of fact, this Court has consistently held that their decisions will not be set aside on appeal unless they are manifestly wrong." *Id.* (internal citations omitted). Both parties charged the other with adultery. Their obligation of proof is well defined. However, the chancellor failed to make any findings of fact regarding Joesie's multiple adulterous acts, nor did she make any findings of fact about whether Michael knew about or condoned any adulterous acts outside the "fling."

¶37. No factual dispute exists about whether Joesie had an extended affair with Kyle while she still was married to Michael, but she admitted only a very limited time frame of her overall adulterous conduct to Michael in August 2013 when he confronted her. Michael

18

testified that, once he confronted her, she produced approximately ten pictures depicting a beach trip with Kyle and others. Joesie admitted during the trial that the affair with Kyle had spanned portions of 2012, 2013, and 2014. Her witnesses testified that in addition to those years, the affair occurred also during portions of 2011 and 2015.

¶38.    Ample evidence in the record supports a finding that Joesie failed to disclose the extent and time frame of her extramarital affairs with Kyle or with another person in the military. Joesie admitted that she never informed Michael that she continued to have a sexual relationship with Kyle through January 2014 or May 2014. She never admitted that she engaged in an extramarital affair in 2012 while Michael was deployed to Guam. While Joesie never admitted that the illicit affair with Kyle began before December 2012, she did testify that it continued for nearly a year without Michael's knowledge. No one produced evidence that Michael's knowledge exceeded what Joesie had told him about the 2013 summer "fling." There is no proof in the record that Michael condoned anything other than that summer "fling." Michael cannot condone extramarital conduct that he did not know about or that was ongoing after Joesie's admission. Joesie had both an "adulterous inclination and a reasonable opportunity to satisfy that inclination," both before and after her confession upon confrontation in August 2013.  *See **Holden***, 680 So. 2d at 798.

¶39.    Condonation, an affirmative defense, was pleaded by Joesie, thus she had the burden of proving that Michael had condoned her infidelity. Joesie must establish, after Michael condoned her multiple acts of adultery beyond her self-confessed "fling" in the summer of

2013, that she did not resume her previous, adulterous inclinations. Failure to mend her prior conduct results in a revival of Michael's ground for divorce, i.e., adultery. By her own admission, Joesie continued her infidelity long after seeking Michael's condonation of the summer 2013 fling.

> The defense of condonation is recognized in our law. ***Stribling v. Stribling***, 215 So. 2d 869, 870 (Miss. 1968); ***Starr v. Starr***, 206 Miss. 1, 39 So. 2d 520, 523 (1949). Condonation is the forgiveness of a marital wrong on the part of the wronged party. Condonation may be expressed or implied. ***Thames v. Thames***, 233 Miss. 24, 29, 100 So. 2d 868, 870 (1958); ***Armstrong v. Armstrong***, 32 Miss. 279, 283 (1856) and ***Scott v. Scott***, 219 Miss. 614, 629, 69 So. 2d 489, 494 (1954).
>
> The mere resumption of residence does not constitute a condonation of past martial sins and does not act as a bar to a divorce being granted. *Compare* Miss. Code Ann. § 93-5-4 (1972). *Condonation, even if a true condonation exists, is conditioned on the offending spouse's continued good behavior. If the offending party does not mend his or her ways and resumes the prior course of conduct, there is a revival of the grounds for divorce.* ***Manning v. Manning***, 160 Miss. 318, 321, 133 So. 673, 674 (1931).
>
> In practical effect, condonation places the offending spouse on a form of temporary probation. Any subsequent conduct within a reasonable time after resumption of cohabitation which evidences an intent not to perform the conditions of the condonation in good faith, may be sufficient to avoid the defense of condonation, even though the conduct so complained of in and of itself may not be grounds for divorce. ***Armstrong v. Armstrong***, 32 Miss. 279, 283 (1856). An entire course of conduct rule applies. *A party's conduct both before and after the alleged condonation can be joined together to establish the cause for divorce.* ***Armstrong v. Armstrong***, 32 Miss. 279, 283 (1856). *Cf.* ***Bias v. Bias***, 493 So. 2d 342, 343 (Miss. 1986).

***Wood v. Wood***, 495 So. 2d 503, 505 (Miss. 1986) (emphasis added).

20

¶40.   This Court has the advantage of reviewing this extensive record at one sitting, a benefit unavailable to a trial court when evidence is presented piecemeal.[18] Our detailed review of the record (absent the distractions visited upon every trial court) reveals that Joesie lied about the beginning, timing, and duration of the affair and attempted to obscure the continuous adulterous relationship with Kyle after Michael had condoned a brief summer "fling," not a course of adulterous behavior spanning years. The chancellor found that Joesie's credibility was questionable about the extent of her relationship with Kyle. Joesie failed to mend her ways by texting Kyle, communicating with Kyle over Facebook, attending the same parties as Kyle, taking overnight trips with Kyle, spending holidays with Kyle and his family, and having sexual relations with Kyle, all after Joesie informed Michael that she had a summer "fling" and had ended it. Michael believed that both he and Joesie were working toward reconciling their marriage. However, Joesie never rid herself of the

---

[18] The Court held the following in ***Lowery v. Lowery***:

> We fully recognize that chancellors are overburdened, and that many cases are tried "piecemeal." Hearings can be, and often are, separated by weeks or even months, as occurred in this proceeding. Chancellors are required to follow the testimony of witnesses, review documents offered as exhibits, and attempt to make contemporaneous notes. Trial judges are not afforded the advantage of appellate courts to review the full record of a case without interruption. Recognition of these impediments is partially responsible for the development of our rules and caselaw requiring findings of fact and conclusions of law that analyze certain factors.

***Lowrey v. Lowrey***, 25 So. 3d 274, 280 (Miss. 2009).

adulterous inclinations, and she continued to place herself in situations which allowed her a reasonable opportunity to satisfy her adulterous inclinations.

¶41.　Joesie's continued secretive, evasive, and deceptive relationship with Kyle, after she informed Michael of her brief fling leading him to attempt to reconcile, "evidences an intent not to perform the conditions of the condonation in good faith." *Id.* These facts preclude application of the affirmative defense of condonation and revive her previous adulterous offenses, entitling Michael to a divorce on the ground of adultery.

¶42.　We find that Joesie's attempt to prove condonation was woefully inadequate, and such a finding was not supported by substantial evidence in the record. A fault-based divorce on the ground of adultery should have been granted to Michael. While we are reluctant to disturb the findings of a chancellor, these findings were manifestly wrong, leading the chancellor to apply an erroneous legal standard. We remand with instructions for the chancellor to enter a judgment of divorce in favor of Michael on the ground of adultery.

## III.　Remaining Issues

¶43.　The law is settled that a chancellor must consider fault when determining alimony. *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993). Because we have ruled that Michael is entitled to a divorce on the ground of adultery, this factor must be considered in the chancellor's subsequent findings. On remand, once a judgment of divorce has been entered in favor of Michael and in light of the attribution of fault to Joesie, the chancellor is instructed to revisit alimony.

¶44. This Court also instructs the chancellor to revisit the issues of visitation and the division of marital assets. We offer the following guidance about those issues.

### A. Visitation

¶45. Michael and Joesie had previously detailed their desires about summer vacation. The non-custodial parent would have custody starting seven days after school ended for the year until seven days prior to the beginning of the next school year. The chancellor's original order did not disturb the agreed-upon schedule. This arrangement worked quite well for more than two years according to Michael and Joesie. In the amended order, the chancellor reduced Michael's summer visitation to only one month without comment. The record is unclear why the chancellor amended the visitation schedule, because neither party requested modification in their motions for reconsideration.

¶46. "Our Court has held that the best interest of the child is the main concern in determining visitation." *Rogers v. Morin*, 791 So. 2d 815, 820 (Miss. 2001) (citing *Dunn v. Dunn*, 609 So. 2d 1277, 1286 (Miss. 1992)). The chancellor is granted "broad discretion" in visitation determinations, and "[t]his Court will not reverse a chancellor's findings of fact so long as they are supported by substantial evidence in the record." *Wilburn v. Wilburn*, 991 So. 2d 1185, 1194 (Miss. 2008) (internal citations omitted). Today's record does not provide us with the benefits of the chancellor's reasoning about why Michael's visitation was substantially reduced absent a prayer for modification and evidence to support a modification. The reason for the chancellor's reduction of Michael's visitation escapes us,

because it is not "supported by substantial evidence in the record." On remand, the chancellor is to reconsider the visitation previously agreed upon by the parties and decreed by the original order.

### B. Amended PSA

¶47. The chancellor granted Joesie's Motion for Reconsideration on the issue of Michael's military retirement but made no mention of Joesie's retirement. The PSA agreed to by the parties was silent about Michael's military retirement, which the chancellor considered to be a significant marital asset, and Joesie's retirement. The chancellor found that the marital portion of the future earnings was limited by the parties' PSA to eight years and five months (101 months) from the date of the marriage, May 7, 2005, through and including the date of the PSA, September 18, 2013. Joesie was awarded 50.5 months (or 22 percent) of Michael's total military retirement benefit.

> In reference to a spouse's equitable right to a share of the other spouse's military retirement pay, this Court reiterated that a chancery court has authority, where equity so demands, to order a fair division of property accumulated through the joint contributions and efforts of the parties. **Brown v. Brown**, 574 So. 2d 688, 690 (Miss. 1990). *See also* **Brendel v. Brendel**, 566 So. 2d 1269, 1273 (Miss. 1990); **Jones v. Jones**, 532 So. 2d 574, 580-81 (Miss. 1988); **Regan v. Regan**, 507 So. 2d 54, 56 (Miss. 1987); **Watts v. Watts**, 466 So. 2d 889, 891 (Miss. 1985); **Clark v. Clark**, 293 So. 2d 447, 459 (Miss. 1974).

**Hemsley v. Hemsley**, 639 So. 2d 909, 914 (Miss. 1994). Once a chancellor divides marital assets, then the court looks to all awards, including alimony, to determine that the final award is equitable and fair. **Ferguson v. Ferguson**, 639 So. 2d 921, 929 (Miss. 1994). Since we are

remanding with instructions for the chancellor to revisit alimony, we instruct that the chancellor consider what effect Michael's retirement and Joesie's retirement have on Joesie's portion of the marital assets.

## CONCLUSION

¶48. We find that the chancery court erred in her declaration that Section 93-5-2 is unconstitutional. We further find that the chancery court erred in applying the affirmative defense of condonation to Joesie's adultery, because it was not supported by the record. The chancellor's opinion is reversed in part, and this matter is remanded for proceedings consistent with this opinion.

¶49. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**WALLER, C.J., KITCHENS, P.J., KING, COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**