# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00230-SCT

*JERRY L. ARTHUR*

*v.*

*PEGGY O. ARTHUR*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/16/93 |
| TRIAL JUDGE: | HON. RAY HILLMAN MONTGOMERY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN W. CHRISTOPHER |
| ATTORNEY FOR APPELLEE: | DON A. MCGRAW, JR. |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART - 4/10/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/1/97 |

**BEFORE SULLIVAN, P.J., SMITH AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. On December 16, 1993, the Chancery Court of Madison County granted Peggy O. Arthur a divorce from Jerry L. Arthur on the grounds of adultery. In addition to awarding Peggy Arthur custody of the parties' minor child, child support, and the exclusive use and possession of the marital home, the court ordered that Jerry Arthur maintain his $150,000 in life insurance and name Peggy Arthur as the beneficiary for the use and benefit of their minor child. The court also awarded to Peggy Arthur one-half interest in the cattle acquired during the marriage, one-half of Jerry Arthur's pension profit sharing fund held by his employer and $1,200 in attorney fees. On appeal before this Court, Jerry Arthur assigns as error the following issues:

> **I. WHETHER THE CHANCELLOR ERRED IN GRANTING PEGGY ARTHUR A DIVORCE ON THE GROUNDS OF ADULTERY.**

> **II. WHETHER THE CHANCELLOR ERRED IN ORDERING JERRY ARTHUR TO NAME PEGGY ARTHUR AS HIS LIFE INSURANCE BENEFICIARY FOR THE USE**

**AND BENEFIT OF THEIR MINOR CHILD.**

**III. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR ONE-HALF INTEREST IN CATTLE ACQUIRED DURING THE MARRIAGE.**

**IV. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR ONE-HALF OF JERRY ARTHUR'S PENSION PROFIT SHARING FUND HELD BY HIS EMPLOYER.**

**V. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR $1,200 IN ATTORNEY FEES.**

## FACTS

¶2. Jerry and Peggy Arthur were married on November 2, 1978, about a year after which they had a child, Kara Rebecca Arthur. At the time of the marriage, Jerry had, from a previous marriage, a three-year-old daughter, Jennifer Arthur, who resided with the parties after the marriage. Peggy had a seven-year-old daughter from a previous marriage, who resided with the parties until she married and moved out in 1991.

¶3. At the time the parties were married and throughout the marriage, Jerry Arthur was employed by People's Construction Company in Jackson, Mississippi, where he plans to work until he retires. After the parties were married, Jerry also became involved in the cattle business when Peggy's father gave Jerry three or five head of cattle.[1] Jerry kept the cattle on Peggy's father's land until the spring of 1993, and paid for the cattle with proceeds from the sales of calves.

¶4. For the first six years of the marriage, Peggy Arthur did not work outside the home, but instead performed the duties of mother and housewife such as cooking, cleaning and caring for the children. She then went to work as an assistant teacher in the Madison County school system for five or six years, after which she went to work for Merchants and Farmers Bank on a part-time basis. Peggy later began working full-time at Merchants and Farmers Bank. Throughout the marriage, Peggy did not contribute any effort towards the maintenance of the cattle operation, in feeding or caring for the cattle.

¶5. The couple's marital problems began when Jerry and Peggy went to their high school class reunion in Sebastopol, Mississippi, in July of 1992. At the reunion they ran into Diane Sharpe, who had attended Sebastopol High School with Jerry and Peggy, and who had been Peggy's "best friend" during high school. Approximately two weeks after the reunion, Jerry Arthur made a phone call to Diane Sharpe and, thereafter, called her several times because, as he testified, "Things weren't going too good at my house and I needed someone to talk to." Jerry admitted calling Diane Sharpe two or three times per week, and that he spent the night with her at her house in Columbus, Mississippi, on two occasions. According to Peggy, when Jerry returned home after one such liaison, he told Peggy that he thought he was in love with Diane Sharpe, and that he needed to be free to find out if it was truly love he felt.

¶6. Peggy Arthur employed Kenneth Willis, a private investigator, who testified that on the afternoon of October 17, 1992, he observed Jerry Arthur and Diane Sharpe drive into Diane's driveway in

Columbus and enter Diane's home. Mr. Willis saw the lights go out in the house around 10:30 p.m., and as of 12:30 a.m. neither Jerry nor Diane had left the house. When Mr. Willis returned to the house at 8:00 the following morning, Jerry's vehicle remained parked in Diane's driveway.

¶7. It is also known that on two occasions Jerry and Diane went out to eat together, once in Columbus and once in Leake County, Mississippi. They dined alone in Columbus, and were accompanied by Jerry's sister in Leake County. Jerry also testified that he was in the company of Diane Sharpe and others at his sister's house on the Mississippi Gulf Coast one weekend in the spring of 1993, and that afterwards Diane drove him back to his home in Leake County.[2] Jerry has denied ever having had sexual relations with Diane Sharpe.

¶8. At the time of trial, Jerry Arthur's income as construction superintendent at Peoples Construction Company was $2,320 per month. He owned thirteen cows, one bull, and ten calves worth $7,500. Jerry also owned tractors and other farm equipment used in the cattle operation, all of which he valued at $7,600. Jerry had a certificate of deposit at Merchants and Farmers Bank in the sum of approximately $5,900, which remained of funds he had inherited from an aunt. Jerry had a pension profit sharing fund at Peoples Construction Company valued at the time of trial at approximately $48,000. The retirement fund had been in place since Jerry started working for Peoples Construction Company in 1969, but there was no evidence at trial as to what portion of those funds had accumulated prior to his 1978 marriage to Peggy. Jerry was covered by two insurance policies: a term life policy in the amount of $100,000 and a whole life policy in the amount of $50,000. The named beneficiaries on both policies were Jennifer (Jerry's daughter from a previous marriage) and Kara (the daughter of Jerry and Peggy).

¶9. At the time of trial, Peggy Arthur's salary at Merchants and Farmers Bank was $1,400 per month. Peggy also had a certificate of deposit in the amount of approximately $9,600 which constituted the balance of proceeds she received from the sale of a home she owned prior to marrying Jerry. Peggy had no retirement fund. At the time of trial, Jennifer and Kara were living with Peggy.

## LAW

### I. WHETHER THE CHANCELLOR ERRED IN GRANTING PEGGY ARTHUR A DIVORCE ON THE GROUNDS OF ADULTERY.

¶10. Jerry Arthur argues that the evidence at trial did not rise above mere suspicion of adultery, and thus the chancellor erred in granting Peggy Arthur a divorce on those grounds.

¶11. The grounds of adultery may be proven by clear and convincing evidence of: (1) an infatuation for a particular person of the opposite sex; and (2) a reasonable opportunity to satisfy that infatuation. *McAdory v. McAdory*, 608 So. 2d 695, 699-700 (Miss. 1992), *appeal after remand,* 628 So. 2d 1388 (Miss. 1993). This Court will not overturn the decision of a chancellor in domestic cases when those findings are supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong or applied an erroneous legal standard. *Kennedy v. Kennedy*, 650 So. 2d 1362, 1366 (Miss. 1995); *Crow v. Crow*, 622 So. 2d 1226, 1228 (Miss. 1993).

¶12. In the case *sub judice*, there was evidence that Jerry Arthur telephoned Diane Sharpe several

times per week, and that Jerry admitted to his wife that he had feelings for Diane. Peggy testified that despite her repeated pleadings with Jerry to leave Diane alone, Jerry continued to communicate with Diane. Also, Jerry admitted that he spent the night with Diane on at least two occasions, and there was testimony by a private investigator to that effect as well. Thus, there was evidence at trial both of Jerry's infatuation with Diane Sharpe and of his reasonable opportunity to satisfy that infatuation. There having been substantial evidence supporting the chancellor's finding of adultery, we hold that the chancellor did not err in granting Peggy Arthur a divorce on the grounds of adultery.

### II. WHETHER THE CHANCELLOR ERRED IN ORDERING JERRY ARTHUR TO NAME PEGGY ARTHUR AS HIS LIFE INSURANCE BENEFICIARY FOR THE USE AND BENEFIT OF THEIR MINOR CHILD.

¶13. At the time of trial, Jerry Arthur's two life insurance policies totaling $150,000 in coverage named both Jennifer and Kara Arthur as beneficiaries. In his judgment, the chancellor ordered Jerry to name Peggy Arthur as the beneficiary on the two policies for the use and benefit of Kara. Jerry argues that this order was inequitable in that it provided, in the event of Jerry's death, for the care of Kara to the exclusion of Jennifer. We find this order to be reversible error.

¶14. Insurance coverage for the benefit of children in divorce cases is an issue of child support. *Brennan v. Brennan*, 638 So. 2d 1320, 1325 (Miss. 1994); *Nichols v. Tedder*, 547 So. 2d 766, 769 (Miss. 1989). A parent's obligation to pay child support lasts only until that child reaches the age of majority, which age in Mississippi is twenty-one for child support purposes. *Nichols*, 547 So. 2d at 770. It follows that a parent who has been ordered to maintain life insurance for the benefit of a minor child may be required to do so only until that child reaches the age of majority. In the absence of other compelling reasons, such as the mental or physical incapacitation of the child, we hold that life insurance benefits for a minor child may be ordered only until the child reaches the age of majority. *See, e.g., Harris v. Deeb*, 605 So. 2d 1325, 1326 (Fla. Dist. Ct. App. 1992); *Bainter v. Bainter*, 590 N.E.2d 1134, 1137 (Ind. Ct. App. 1992); *Whitten v. Whitten*, 592 So. 2d 183, 186 (Ala. 1991); *Thomas v. Studley*, 571 N.E.2d 454, 460 (Ohio Ct. App. 1989); *Gluck v. Gluck*, 520 N.Y.S.2d 581, 582-83 (N.Y. App. Div. 1987).

¶15. Jennifer Arthur, although still a minor at the time of trial, turned twenty-one on October 13, 1996. Being the age of majority, she no longer would be entitled to child support from her father had the chancellor ordered it. However, this does not affect her father's right to secure life insurance for her benefit, and the chancellor lacked the authority to remove Jennifer from the policy. That right rests in her father.

¶16. Jerry also argues that it was error for the chancellor to order that Peggy be named as Jerry's life insurance beneficiary for the use and benefit of Kara, rather than ordering that Kara herself be named the beneficiary. Jerry contends that in order to protect Kara from the squandering by her mother of any potential insurance proceeds, the chancellor should have named Kara the beneficiary. We agree.

¶17. Indeed, this Court stated in *Nichols* that regarding child support, a parent may be required to maintain life insurance on his/her own life "with the *child* named as beneficiary." 547 So. 2d at 769 (emphasis added). In the event of that parent's death, a guardian -- in this case, Peggy -- would be appointed to administer the proceeds so as to invoke the protection of court supervision provided in the guardianship statutes, Miss. Code Ann. § 93-13-1 et seq. (1972). In order to safeguard Kara's

interest in child support in the nature of potential life insurance proceeds, and to protect Jerry's right to name Jennifer as his beneficiary, we reverse on this issue and render with instructions that Kara and Jennifer be named the beneficiaries of the policies, subject to Jerry's right to remove Jennifer.

### III. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR ONE-HALF INTEREST IN CATTLE ACQUIRED DURING THE MARRIAGE.

### IV. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR ONE-HALF OF JERRY ARTHUR'S PENSION PROFIT SHARING FUND HELD BY HIS EMPLOYER.

¶18. Because these two assignments of error both involve the equitable division of marital assets, we will first discuss the applicable law and this Court's standard of review. The propriety of each contested award to Peggy Arthur will thereafter be discussed in turn.

### A. Applicable Law and Standard of Review

¶19. In *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994), this Court determined that marital assets subject to equitable distribution by the chancellor are any and all assets "acquired or accumulated during the marriage." A spouse who has made a material contribution toward the acquisition of an asset titled in the other spouse's name may claim an equitable interest in such jointly accumulated property. *Hemsley*, 639 So. 2d at 913; *Jones v. Jones*, 532 So. 2d 574, 580-81 (Miss. 1988). Assets are not subject to distribution where it can be shown that such assets "are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley*, 639 So. 2d at 914.

¶20. This Court has for several years recognized that in making equitable divisions of marital property upon divorce, chancellors are not limited to considering only the earning and cash contributions of each party to the accumulation of the property, but rather "[i]t is sufficient contribution if one party renders services generally regarded as domestic in nature." *Draper v. Draper*, 627 So. 2d 302, 306 (Miss. 1993) (citing *White v. White*, 557 So. 2d 480, 485 (Miss. 1989) ). "We assume for divorce purposes that the contributions and efforts of the marital partners, whether economic, domestic or otherwise are of equal value." *Hemsley*, 639 So. 2d at 915.

¶21. In *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994), this Court set forth the factors to be considered by chancellors when making equitable divisions of marital property:

1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:

a. Direct or indirect economic contribution to the acquisition of the property;

b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.

3. The market value and the emotional value of the assets subject to distribution.

4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

¶22. The equitable distribution of marital assets is committed to the discretion of the chancellor, whose findings will not be disturbed by this Court unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. *Ferguson*, 639 So. 2d at 928, 930.

### B. One-half Interest in Cattle Acquired During the Marriage

¶23. Jerry Arthur argues that the holdings in *Hemsley* and *Ferguson* are in conflict as to whether the cattle acquired during the course of the marriage constitute marital property subject to equitable distribution. Although Jerry admits that the cattle would be subject to distribution under the definition of marital assets in *Hemsley*, he contends that the *Ferguson* factors indicate the cattle in fact are not marital assets subject to distribution. We find that Jerry has misunderstood the point of the *Ferguson* opinion.

¶24. The *Ferguson* factors make no attempt to define *which* assets are marital property subject to distribution, but rather constitute guidelines regarding *how* chancellors are to equitably divide marital property. Under *Hemsley*, the chancellor in the case *sub judice* clearly had the authority to equitably distribute cattle acquired during the marriage. It is by considering the *Ferguson* factors that the chancellor must then determine what would constitute an equitable distribution.

¶25. Jerry contends that since Peggy Arthur neither contributed funds towards the purchase of the cattle nor provided labor for the raising, caring and feeding of the cattle, then the chancellor erred in awarding one-half interest in the cattle to her. However, as stated by this Court in previous cases and as reflected in the *Ferguson* guidelines, the chancellor may -- and in fact must -- consider Peggy's contributions by way of the performance of domestic, family duties. While Jerry tended the cattle, Peggy stayed home to run the house, do yard work, and care for the children. There are also other factors which in equity should be considered, as is permitted by *Ferguson*. It would be a fair assumption that but for Jerry's marriage to Peggy, Peggy's father likely would not have given Jerry cattle to get him started in the business in the first place. Furthermore, until the spring of 1993, which

was after Jerry and Peggy had separated, the cattle were kept on Peggy's father's land. We therefore hold that the chancellor did not manifestly err in awarding to Peggy Arthur one-half interest in the cattle acquired during the marriage.

### C. One-half of Jerry Arthur's Pension Fund Held by His Employer.

¶26. In this assignment of error, Jerry Arthur does not contest the entire award of one-half of his retirement fund to Peggy Arthur, but rather he appeals only from the award of one-half of his retirement funds which were accumulated prior to his marriage to Peggy. Jerry's pension profit sharing fund at Peoples Construction Company had been accumulating funds since he began working there in 1969. Although Jerry and Peggy were not married until 1978, the chancellor awarded to Peggy one-half of all of Jerry's retirement funds accumulated at the time of divorce. Jerry argues that the chancellor had no authority to award any portion of those funds which were accumulated prior to the parties' marriage.

¶27. Indeed, the retirement funds at issue not having been "acquired or accumulated *during* the marriage," they do not fall within *Hemsley*'s definition of marital assets subject to equitable distribution. 639 So. 2d at 915 (emphasis added). The evidence indicates instead that these funds are "attributable to one of the parties' separate estates *prior* to the marriage." *Id.* at 914 (emphasis added). Jerry's retirement funds which were accumulated prior to the parties' marriage are therefore clearly the type of assets this Court determined in *Hemsley* would not be subject to equitable distribution upon divorce. Peggy Arthur thus was not entitled to one-half of Jerry's pension funds accumulated prior to the marriage, nor to any portion of the interest thereon. There having been no evidence at trial as to what portion of the funds was accumulated prior to the marriage, we reverse this award and remand for a determination thereof.

### V. WHETHER THE CHANCELLOR ERRED IN AWARDING TO PEGGY ARTHUR $1,200 IN ATTORNEY FEES.

¶28. Jerry argues that Peggy was financially able to pay her own attorney fees, and thus under *Cheatham v. Cheatham*, 537 So. 2d 435, 440 (Miss. 1988), she was not entitled to an attorney fee award. Jerry points out that in addition to her $1,400-per-month income from Merchants and Farmers Bank, Peggy had a certificate of deposit of approximately $10,000 and owned an undivided one-half interest in the marital residence, of which she was awarded exclusive use and possession with Jerry paying the mortgage and maintenance costs. Peggy testified at trial that she had already paid $1,300 in attorney fees and owed an additional $970.

¶29. Peggy urges this Court to compare the facts of this case with those of *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994), wherein the wife's annual income was over $20,000 and she had a savings account with a balance in excess of $9,100. This Court affirmed the chancellor's award to the wife of one-half of her $5,641.18 in attorney fees. *Hemsley*, 639 So. 2d at 915.

¶30. The award of attorney fees in a divorce case is generally left to the discretion of the chancellor. *Id.*; *Adams v. Adams*, 591 So. 2d 431, 435 (Miss. 1991); *Cheatham*, 537 So. 2d at 440. "We are 'reluctant to disturb a chancellor's discretionary determination whether or not to award attorney fees and of the amount of [any] award.'" *Ferguson v. Ferguson*, 639 So. 2d 921, 937 (Miss. 1994) (quoting *Geiger v. Geiger*, 530 So. 2d 185, 187 (Miss. 1988)). We hold that the chancellor did not

abuse his discretion in awarding to Peggy Arthur $1,200 in attorney fees.

## **CONCLUSION**

¶31. We reverse the chancellor's order that Peggy be named the beneficiary of the two life insurance policies for the use and benefit of Kara, and render with instructions that Kara and Jennifer be named the beneficiary of the policies. Since Jennifer is above the age of majority, the right to continue to list her as a beneficiary is her father's right, not the province of the Court. We also find merit in Jerry's contention that the chancellor erred in awarding to Peggy Arthur one-half of Jerry's retirement fund, in that the chancellor had no authority to distribute any portion of those funds accumulated prior to the parties' marriage. We therefore reverse the award and remand for a determination of what portion of the retirement fund, and interest thereon, was accumulated prior to the marriage. We affirm as to all other assignments of error.

¶32. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., PITTMAN, BANKS, McRAE, ROBERTS AND SMITH, JJ., CONCUR.**

1. The parties could not definitively say at trial whether the number of cattle given by Peggy's father was three or five.

2. This occurred after Jerry and Peggy had separated.