# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00141-COA

| | |
|---|---|
| IN THE MATTER OF THE DISSOLUTION OF THE MARRIAGE OF TODD C. TAUZIN AND PAULA M. TAUZIN: TODD C. TAUZIN | APPELLANT |

v.

| | |
|---|---|
| PAULA M. TAUZIN | APPELLEE |

| | |
|---|---|
| DATE OF JUDGMENT: | 10/24/2023 |
| TRIAL JUDGE: | HON. CYNTHIA L. BREWER |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | MICHAEL J. MALOUF |
| | JARED WILLIAM PHILLIPS |
| | MELISSA ANN MALOUF |
| ATTORNEY FOR APPELLEE: | DAVID BRIDGES |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | REVERSED AND REMANDED - 08/12/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.    Todd and Paula Tauzin signed an Antenuptial Agreement prior to their marriage in 2006. Fifteen years later, they consented to an irreconcilable differences divorce and stipulated that the Antenuptial Agreement was valid and enforceable. Following a trial on contested issues, the chancellor divided the marital estate and denied Paula's request for alimony. On appeal, Todd challenges the chancellor's interpretation and application of the Antenuptial Agreement and division of the marital estate.

## FACTS AND PROCEDURAL HISTORY

¶2.    Prior to their 2006 marriage, Todd and Paula signed an Antenuptial Agreement. No

children were born of the marriage, but Todd and Paula each had a daughter from a prior marriage. Todd worked as an agent and financial adviser with Northwestern Mutual beginning in 1988, and he was still working there at the time of trial in 2023. At the time of their marriage, Paula had been working at Mississippi Magazine for seventeen years. However, Paula later left her job to become "a stay-at-home wife."

¶3. The Antenuptial Agreement listed certain assets as Paula's "Separate Holdings" and other assets as Todd's "Separate Holdings." As it relates to Todd's "Separate Holdings," the Agreement provided in part:

> 3. <u>Rights to [Todd's] Separate Holdings</u>. [Todd] shall hold all interest in [Todd's] Separate Holdings free from any claim that might be made by [Paula] by reason of the marriage and with the same effect as if no marriage had been solemnized between the parties. [Paula] shall not acquire by said contemplated marriage for herself, her heirs, assigns, or creditors, any interest in [Todd's] Separate Holdings or the right to control thereof, or any interest in the income, increase, profits, dividends, or gains of whatever nature or kind, whether active or passive, arising from the corpus of those assets as of the date of the marriage.

> 4. <u>Release of [Paula's] Marital Rights</u>. [Paula] specifically waives, releases, conveys, quitclaims and surrenders all statutory and other rights to [Todd's] Separate Holdings now owned or hereafter acquired by [Todd], which she may otherwise acquire in such property as the spouse of [Todd], under the laws now or hereafter in effect in any jurisdiction including, but not limited to, rights arising by way of dower, curtesy, distributive share, right of election to take against a will, widower's allowance, or otherwise, as well as any rights to share in [Todd's] Separate Holdings, which may arise in the event of divorce. Nothing contained in this agreement, however, is intended to preclude [Todd] in the future from voluntarily making provisions for, or granting powers or rights to, [Paula] with respect to [Todd's] Separate Holdings by virtue of any written disposition or directive including, but not limited to, will, codicil, designation of beneficiary(ies) or the like. However, any such future provisions must be in writing and signed by [Todd] to be effective.

2

The Agreement contained reciprocal provisions protecting and waiving Todd's rights to Paula's "Separate Holdings."

¶4. A list of Todd's assets and liabilities was attached to the Agreement as Exhibit A, and a disclosure of Paula's interests in certain closely held family businesses, financial statements for those businesses, and Paula's father's will were attached as Exhibits B-1 through B-7.

¶5. In August 2021, Todd and Paula consented to an irreconcilable differences divorce. They stipulated that their Antenuptial Agreement was "valid and enforceable" and submitted the following issues to the chancellor for decision: (1) the interpretation and application of the Antenuptial Agreement; (2) the identification, valuation, and classification of the parties' assets; (3) the date of demarcation; (4) the equitable division of the marital estate; and (5) alimony. The parties later stipulated that December 31, 2020, was the date of demarcation, and the chancellor adopted their stipulation in a June 2022 order.

¶6. In October 2022, the chancellor ordered Todd to pay Paula $10,000 a month for three months, and in March 2023, the chancellor ordered Todd to pay Paula $3,000 per month until a final judgment was entered. The chancellor reserved ruling as to whether the payments would be treated as temporary support or a partial distribution of Paula's share of the marital estate. In the final judgment, the chancellor classified the payments as temporary support.

¶7. The contested issues were tried in January 2023. Prior to trial, Paula filed a motion to exclude parole evidence. She argued that unless the chancellor found that the Antenuptial Agreement was ambiguous, parole evidence regarding its meaning was inadmissible. Todd argued that the Agreement was ambiguous and that parole evidence was relevant as long as

3

it did not contradict the Agreement's terms. The chancellor denied Paula's motion, ruling that any objections to parole evidence could be addressed during trial.

¶8. Todd and Paula gave vastly different accounts of their marriage. Paula testified that she became a "stay-at-home wife" because it was "really important to Todd." She stated that "Todd never told [her] to find a job outside of the home." However, Todd denied that he wanted Paula to quit her job and said that he wanted her to work. He testified that they frequently argued about her unwillingness to work.

¶9. In addition, Paula stated that Todd "never complained" about her spending habits, while Todd testified that the most frequent source of "strife" during the marriage was Paula's "wasting money." Todd complained that although Paula did not have a job, she employed a housekeeper five days a week. Todd testified that to save money, he reduced the housekeeper to three days a week when Paula's daughter left for college and eventually to two days a week. However, Paula testified that she only employed the housekeeper for five days a week while she was recovering from an illness.

¶10. Paula testified that Todd's lifestyle required her to maintain "an extensive wardrobe" and that Todd wanted her to "project an air of wealth." Todd denied these assertions. Todd also complained that Paula had at least four or five cosmetic surgeries during the marriage, which he considered unnecessary. Paula testified that she hosted dinner parties for Todd's work and helped him to generate clients. However, Todd testified that Paula only hosted two dinner parties and referred three clients (her mother, her hairdresser, and a friend) in all the years they were married.

4

¶11. Paula testified that she used her separate funds to pay for her daughter's expenses, including tuition and college expenses. However, Todd testified that he paid for part of Paula's daughter's tuition and expenses and also bought her two vehicles.

¶12. Paula testified that Todd paid for the mortgage, utilities, and groceries, although she "occasional[ly]" paid for groceries. Todd also paid the bill on an American Express card that he gave Paula for household expenses and other purchases. Todd also gave Paula $500 every two weeks. Todd testified that Paula bought "a lot of clothes" with the American Express card. He eventually put a "cap" of $7,500 per month on Paula's American Express card because he felt that her spending was out of control.

¶13. Paula had separate funds prior to and during the marriage, which she spent as she saw fit during the marriage. Paula's father owned several Fred's dollar stores, pharmacies, and related businesses. When Paula's father died in 2006, she began receiving distributions from the businesses. In 2015, Paula sold her interests in two of the businesses to her brother for promissory notes. Pursuant to the notes, Paula's brother paid her approximately $10,000 per month for eight years. Around 2018, Paula received approximately $500,000 in distributions from her remaining interests in the family businesses. She deposited the funds in an IRA, but she testified that she only had about $50,000 left in the IRA by the time of trial. She testified that other than the IRA, she did not "have any money left." After the parties separated, Paula began working at an Ace Hardware store her brother owned.

¶14. Todd testified that he and Paula "kept everything separate except for jointly [titled] property," they "filed separate tax returns," and they "didn't commingle funds." Although

5

Paula and Todd owned a condominium in Oxford that was titled in both their names, Todd testified that he used his own funds to pay for the property.

¶15. Todd owned a Trustmark bank account ("8601") prior to his marriage to Paula. During the marriage, Todd deposited his earnings into the account and used it to pay taxes, make investments, buy personal vehicles, pay life insurance premiums, buy office furniture and equipment, and pay for household expenses. Todd agreed that he used funds in the account to buy interests in eleven different businesses during the marriage. Paula alleged that Todd deposited earnings of approximately $15,000,000 into the 8601 account between 2015 and 2022. However, Todd testified that he deposited less than $12,400,000 into the account during that period.

¶16. Todd owned eight life insurance policies at the time of the marriage, all of which were listed in Exhibit A to the Antenuptial Agreement. During the marriage, Todd obtained thirteen additional life insurance policies. Those policies did not yet exist at the time of the marriage and, thus, were not listed in Exhibit A.

¶17. Todd testified that he receives a commission when he first sells a Northwestern policy and receives an additional payment or "renewal" when the policyholder pays the premium each year for a maximum of ten years. Because of the ten-year limit, Todd agreed that the "renewals" included in his "Separate Holdings" in the Antenuptial Agreement had all been paid out. For the same reason, the "renewals" calculated as of the date of demarcation (December 31, 2020) were based entirely on policies he sold during the marriage. The estimated renewal payments were included on Todd's commission statements each month,

6

which included vested and non-vested portions.

¶18.   Greg Steinbrenner, a Northwestern representative, testified by deposition regarding Todd's compensation.  Steinbrenner testified that the difference between vested and non-vested renewals is that Todd "does not need to be on an active contract [with Northwestern] in order to receive [the vested renewals]," but he would "forfeit[]" the non-vested renewals if he retired.

¶19.   As of the date of demarcation, Todd owned four deferred compensation accounts: (1) 1999 FT, valued at $68,208.04; (2) 2013 FT, valued at $67,728.78; (3) 2015 FT, valued at $193,160.10; and (4) 2020 FT, valued at $87,618.82.  Todd testified that he believed that the account numbers referred to the years in which the deferred compensation was earned.  Thus, Todd agreed that 1999 FT was the only account earned prior to the marriage.

¶20.   Prior to trial, the parties "stipulated" that the value of the "Qualified" portion of Todd's Agent Retirement Plan (ARP) was $923,434.12 and that the value of the "Non-Qualified" portion of Todd's ARP was $2,452,098.50 as of the date of demarcation.  They did not stipulate as to whether the ARP was marital or separate property.  A court order that both parties approved as to form and content memorialized their stipulation regarding the values of the ARP.  At trial, however, Todd maintained that the Non-Qualified portion of his ARP "has no value to it" because it was "not guaranteed," "liquid," or "divisible" and was just "a carrot that Northwestern Mutual put out there that is not funded or secured by Northwestern Mutual."  Todd testified that he was "unsure of the value" of the Qualified portion "because that's not something he would put on [his] balance sheet."

¶21. Todd acknowledged that his ARP was not listed among his "Separate Holdings" or in Exhibit A to the Antenuptial Agreement. Todd maintained that the ARP was not listed because it had "no value." Todd testified that he had the account at the time of his marriage to Paula, but he stated that he did not know the value of his ARP at that time. As we discuss in more detail below, Todd believed other provisions of the Antenuptial Agreement preserved the separate character of the entire ARP.

¶22. Steinbrenner testified that the ARP "is a defined benefit plan that is company funded and is credited based on a formula that looks at sales and revenue generated by [the agent]." Steinbrenner testified that Todd would begin receiving annual payments under the ARP at age 65 and that the payments would continue until Todd died. Steinbrenner testified that the ARP was similar to a pension and that its value could not be withdrawn or liquidated.

¶23. Kenny Parker, a certified public accountant, testified on behalf of Paula as an expert in the field of accounting. Parker disagreed with Todd's contention that the Non-Qualified portion of the ARP was "unsecured." Parker opined that although the ARP "is not a cash account," Northwestern "has reserved funds for it." Parker testified that Todd would get the money from the ARP unless he dies or Northwestern goes out of business. On cross-examination, Parker testified that his knowledge regarding the ARP was based on his review of Steinbrenner's deposition.

¶24. The chancellor entered a final judgment in October 2023. The chancellor concluded that the Antenuptial Agreement was "clear and unambiguous." The chancellor reasoned that Paula did not waive her rights to the ARP because it was not listed in the Agreement as one

of Todd's "Separate Holdings."

¶25. The chancellor found that Todd's Trustmark account (8601) was marital property because it was not included in Todd's "Separate Holdings" in the Antenuptial Agreement, although it was disclosed in Exhibit A to the Agreement. The chancellor ruled that the account and funds deposited into and transferred out of it during the marriage were marital property, except that Todd was given credit for the premarital balance of $6,890.56.

¶26. The chancellor found that the eight life insurance policies listed as Todd's Separate Holdings in the Antenuptial Agreement were Todd's separate property. However, the thirteen policies that Todd acquired during the marriage were marital property.

¶27. The chancellor found that Todd's vested commissions or "renewals" were earned during the marriage, were not protected by the Antenuptial Agreement, and were marital property.

¶28. The chancellor found that Todd's deferred compensation account 1999 FT was his separate property because it was included in the Antenuptial Agreement under Todd's Separate Holdings. However, Todd's other deferred compensation accounts—2013 FT, 2015 FT, and 2020 FT—were not protected by the Agreement and were created during the marriage. The chancellor found that those three accounts were marital property because Todd failed to show that they were his separate property.

¶29. The chancellor found that Todd's ARP was marital property because it was earned during the marriage and was not protected by the Antenuptial Agreement.

¶30. The chancellor found that other assets and business interests were marital property

9

because they were acquired during the marriage with funds from the Trustmark account (8601), which was marital property, and Todd could not trace them to any separate assets.

¶31. The chancellor then discussed the *Ferguson*[1] factors and divided the parties' property. Ultimately, the chancellor found that there was a "reasonable basis to award a 50/50 split of the entire marital estate." Todd was awarded the exclusive use, possession, and ownership of the marital home, three vehicles, half the proceeds from the sale of their condominium in Oxford, his personal property and office furnishings, financial and investment accounts, insurance policies, retirement and benefit accounts, and business interests. Paula was awarded one vehicle, half the proceeds from the sale of their condominium, personal property and furnishings from the Oxford condominium, personal property from the marital home, financial accounts, and four life insurance policies. The chancellor noted that this division left Paula with "less than seven percent . . . of the net marital estate."

¶32. "Instead of splitting each asset," the chancellor opted to "achieve equitable division by awarding more assets to Todd and ordering Todd to pay Paula for her portion of marital assets." To accomplish "a 50/50 split," the chancellor ordered Todd to pay Paula $5,670,109 "as a property division equalizing payment." The chancellor ordered Todd to pay $3,000,000 within forty-five days of the judgment and the remaining balance within thirty months. Finally, the chancellor found that "the parties shall split equally (50/50) the costs, fees, penalties, and/or taxes, if any, associated with the transfer of said funds to Paula." The chancellor denied Paula's request for alimony, finding that the "equitable division award,

---

[1] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

coupled with [Paula's] current income and the assets from her separate property, [would] adequately provide for Paula's needs."

¶33. Todd filed a motion for reconsideration pursuant to Mississippi Rule of Civil Procedure 59. At the hearing on his motion, Todd requested that Bill Iupe, a certified public accountant, be allowed to testify regarding the "tax consequences" of the chancellor's equitable division and the net present values of Todd's ARP, deferred compensation accounts, and vested renewals. Paula objected, and the chancellor sustained the objection, ruling that a motion for reconsideration was not the "proper mechanism" for offering "new testimony." The chancellor allowed Todd's counsel to make a proffer of Iupe's proposed testimony, and certain calculations Iupe performed were marked for identification. Iupe would have testified that the net present values of Todd's ARP, deferred compensation, and vested renewals were significantly lower than the values previously stipulated to by the parties and/or determined by the chancellor. Iupe also would have testified regarding the tax consequences and penalties Todd would incur by liquidating assets to make the cash payments ordered by the chancellor. Following the hearing, the chancellor denied Todd's motion, and Todd filed a notice of appeal.

## ANALYSIS

¶34. On appeal, Todd argues that the chancellor erred (1) "by refusing to enforce the Pension Waiver of the Antenuptial Agreement"; (2) "by not classifying the premarital portion of Todd's ARP as his separate asset"; (3) "by ruling that Todd's separate premarital assets were not protected by the Antenuptial Agreement"; (4) "in not making findings of fact and

11

conclusions of law under the *Ferguson* factors"; and (5) "in not providing for a fifty-fifty split of the tax consequences of the equitable distribution."

¶35.    "We employ a limited standard of review in domestic relations cases." *Gerty v. Gerty*, 265 So. 3d 121, 130 (¶33) (Miss. 2018).  "Generally, this Court will not disturb the findings of a chancellor when supported by substantial evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Id.* (brackets and quotation marks omitted).  "However, . . . contract interpretation is a question of law, which is reviewed de novo." *Id.* (brackets and quotation marks omitted). "All other questions of law also are reviewed de novo, and the reviewing court will reverse if the law has been applied or interpreted erroneously." *Id.* (quotation marks omitted).

## I.    The "Pension Waiver"

¶36.    Todd first argues that the chancellor erred by refusing to enforce the Antenuptial Agreement's "Pension Waiver."  Specifically, he asserts that the chancellor "exceeded her statutory authority in that she adjudicated issues the parties did not consent for her to decide" and "applied an erroneous legal standard by ruling that Todd failed to make a written financial disclosure of his ARP."  In a section titled "Pension Waiver," the parties' Agreement states:

>    10.    Pension Waiver.  Each party agrees to consent to the other's election, to waive the qualified joint and survivor annuity form of benefit and the qualified pre-retirement survivor annuity form of benefit under any plan of deferred compensation to which § 401(a)(11)(B) of the Internal Revenue Code (the "Code") and/or § 205(b)(1) of the Employee Retirement Income Security Act of 1974 ("ERISA") shall apply and in which either party currently or hereafter may be a vested participant within the meaning of § 417(f)(1) of the Code and § 205(h)(1) of ERISA.  Each party further consents to the other's

12

current and future designation of beneficiaries other than each other under any of such plans (and to any revocation and/or modification of such designations), including any of such plans referred to in § 401(a)(11)(B)(iii) of the Code or § 205(b)(1)(C) of ERISA. It is further agreed and understood between the parties that the written waivers as herein above referred shall be executed subsequent to the parties' marriage, when they shall have respectively achieved the status of "spouse" as required under ERISA for such waivers to be valid and binding.

¶37. Todd argues that because he and Paula had previously stipulated that the Antenuptial Agreement was valid and enforceable, the chancellor exceeded her authority by ruling that Paula did not waive her right to Todd's ARP. It is true that when the parties consent to an irreconcilable differences divorce, the chancellor "is limited to the resolution of those issues specifically identified and personally agreed to in writing by the parties." *Myrick v. Myrick*, 186 So. 3d 429, 433 (¶17) (Miss. Ct. App. 2016) (quoting *Wideman v. Wideman*, 909 So. 2d 140, 146 (¶22) (Miss. Ct. App. 2005)). Here, the parties' written consent to an irreconcilable differences divorce and stipulation of the issues to be tried expressly stated that the chancellor would determine the proper "interpretation and application of the Antenuptial Agreement" and would also determine the proper classification of the parties' assets. In her decision, the chancellor did not refuse to enforce the Antenuptial Agreement. Rather, consistent with the parties' stipulation, the chancellor interpreted and applied the Agreement and classified the parties' assets as marital or separate. The parties specifically authorized the chancellor to decide those issues.

¶38. "An antenuptial agreement is a contract and should be interpreted just like any other contract." *Bowman v. Bowman*, 332 So. 3d 317, 321 (¶5) (Miss. Ct. App. 2021); *see also Smith v. Smith*, 656 So. 2d 1143, 1147 (Miss. 1995) ("[T]he same rules of construction and

13

interpretation apply" to "an antenuptial contract . . . as any other contract."). The first rule of contract interpretation is that if the contract is not ambiguous, it must be enforced as written. *Bowman*, 332 So. 3d at 321 (¶5).

¶39. With respect to the interpretive issue that Todd raises on appeal, what is most striking and significant about the Antenuptial Agreement is that Todd's ARP—which existed when the Antenuptial Agreement was signed—is *not* listed in Todd's Separate Holdings. The Agreement identifies a detailed list of assets as Todd's Separate Holdings and then makes abundantly clear in paragraphs 3 and 4 of the Agreement that Paula shall not acquire any interest in, and waives all rights to, Todd's Separate Holdings. *See supra* ¶3. It would have been very easy to include Todd's ARP in Todd's Separate Holdings and thereby make clear that Paula waived any right to Todd's ARP. However, the parties did not do so.

¶40. Todd's reliance on the "Pension Waiver" in section 10 of the Antenuptial Agreement is misplaced. Section 10 states that "[e]ach party agrees to consent to the other's election[] to waive" survivor annuity benefits under any deferred compensation plan governed by certain sections of the Internal Revenue Code or ERISA. Each party also consented to the other's "designation of beneficiaries other than each other under any of such plans." Finally, the parties agreed to execute "written waivers . . . subsequent to the parties' marriage" to effectuate section 10.[2] Thus, to summarize, each party agreed that after they were married, at "the other's election," they would execute written waivers of their rights to certain survivor

---

[2] The parties agreed to execute written waivers "subsequent to the marriage" because courts have held that antenuptial agreements are ineffective to waive the rights of a surviving spouse under an ERISA plan; rather, such written waivers must be executed after the marriage. *See, e.g.*, *Zinn v. Donaldson Co.*, 799 F. Supp. 69, 72-73 (D. Minn. 1992).

annuity benefits under a deferred compensation plan. However, there is no evidence that Todd ever asked Paula to sign any written waiver of any annuity benefits under his ARP. More important, although the parties agreed in section 10 to waive certain survivor annuity benefits, they did not agree to waive any potential property interests in the marital portion of any plan accumulated during the marriage. The place to have waived such rights would have been in the previous sections of the Antenuptial Agreement that dealt with the parties' respective Separate Holdings. As discussed above, those sections of the Agreement *clearly* waived all rights and claims Paula might have had against the assets specifically designated as Todd's Separate Holdings.[3] But, again, what is notable about that part of the Agreement is that Todd's ARP is *omitted* from his designated Separate Holdings. Because Todd's ARP was omitted from his Separate Holdings, we conclude that the chancellor did not err by ruling that the Agreement was not ambiguous and that it did not waive Paula's rights to the marital portion of Todd's ARP.

## II.    The Premarital Portion of Todd's ARP

¶41.    Todd also argues that the chancellor erred by not classifying the premarital portion of

---

[3] Section 10 of the parties' Antenuptial Agreement addressed survivor annuity benefits under ERISA and required Paula to execute written waivers "subsequent to the marriage" in order to effectively waive her rights to such benefits under ERISA. *See supra* note 2. As one court has noted, "it is the survivor benefit that is protected by ERISA, *not a divorcing spouse's marital interest in a . . . spouse's pension plan*." *Savage-Keough v. Keough*, 861 A.2d 131, 137 (N.J. Super. Ct. App. Div. 2004) (emphasis added); *accord Critchell v. Critchell*, 746 A.2d 282, 286-88 (D.C. 2000) (explaining that ERISA and its waiver requirements only deal with survivor annuity benefits, not a divorcing spouse's "property interest in her husband's pension at the time of divorce"). If Todd wanted to require Paula to waive her property interest in his ARP plan upon divorce, he should have included the ARP plan in Todd's Separate Holdings.

15

his ARP as his separate asset. Northwestern documents regarding Todd's ARP show that Todd began accumulating his ARP in April 1988—eighteen years before he married Paula—and became fully vested in 1993. Nonetheless, the chancellor treated the entire ARP as a marital asset. Todd argues that this was error.

¶42.     In *Arthur v. Arthur*, 691 So. 2d 997 (Miss. 1997), the husband's "pension profit sharing fund . . . had been accumulating funds since he began working" for his employer nine years prior to the parties' marriage. *Id.* at 1003. Nonetheless, "the chancellor awarded to [the wife] one-half of all of [the husband's] retirement funds accumulated at the time of divorce." *Id.* On appeal, the husband argued "that the chancellor had no authority to award any portion of those funds which were accumulated prior to the parties' marriage." *Id.* The Supreme Court agreed. *Id.* at 1003-04. "Indeed," the Court stated, "the retirement funds at issue not having been 'acquired or accumulated *during* the marriage,' they do not fall within *Hemsley*'s definition of marital assets subject to equitable distribution." *Id.* at 1003 (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)). Because the portion of the plan accumulated prior to the marriage was "attributable to [the husband's] separate estate[] *prior* to the marriage," it was "clearly the type of asset[] [the] Court determined in *Hemsley* would not be subject to equitable distribution upon divorce." *Id.* (quoting *Hemsley*, 639 So. 2d at 914). The Court held that the wife "was not entitled to one-half of [the husband's] pension funds accumulated prior to the marriage, nor to any portion of the interest thereon." *Id.* at 1003-04. Moreover, the Court reversed and remanded for the chancellor to determine what portion of the pension was the husband's separate property—even though the husband had

16

presented "no evidence at trial as to what portion of the funds was accumulated prior to the marriage." *Id.* at 1004.

¶43. This Court subsequently applied *Arthur*'s holding in *Dye v. Dye*, 22 So. 3d 1241, 1244-45 (¶¶12-14) (Miss. Ct. App. 2009). In *Dye*, the husband argued that the chancellor erred by not classifying the portion of a retirement account that he had accumulated prior to the marriage as his separate property. *Id.* at 1244 (¶12). The chancellor had classified the entire account as marital property even though the record showed that the husband had worked for the employer for eight years prior to the parties' marriage. *Id.* After discussing the Supreme Court's opinion in *Arthur*, this Court stated:

> We reach the same conclusion as did the *Arthur* court. The chancellor erred in considering the entirety of [the] retirement account as a part of the marital estate. Clearly, the portion of the retirement account that accumulated prior to the parties' marriage is [the husband's] separate property. On remand, the chancellor must determine the percentage of the retirement account that was accumulated prior to the marriage and deduct that amount from the total amount of the retirement account that had been accumulated at the time of the divorce.

*Id.* at 1245 (¶14).

¶44. Todd argues that *Arthur* and *Dye* are on point and mandate the same result in this case. He argues that the chancellor erred by classifying the entire ARP as marital property even though he accumulated it for eighteen years *prior* to the parties' marriage. In response, Paula does not address either *Arthur* or *Dye*. Instead, Paula seizes on Todd's testimony that the ARP had no value at the time of the marriage, and she argues that the chancellor appropriately classified the entire ARP as marital property based on Todd's own testimony. This argument will not work. Todd's lay testimony was that the ARP had no value both at

17

the time of the marriage *and at the time of trial*. *See supra* ¶¶20-21. This was clearly not the case. The ARP has value, and the *marital portion* was subject to equitable division. Todd's lay testimony was not consistent with the law and cannot justify the chancellor's decision to classify the entire ARP as marital property.

¶45. No expert testimony was presented at trial regarding the value of the ARP at the time of the marriage or the values of the separate and marital portions of the ARP.[4] Ordinarily, it is the parties' responsibility to present evidence regarding the value of marital assets, and even if the "available proof" presented by the parties is "something less than ideal," the chancellor's ruling will be affirmed as long as her findings have "some evidentiary support in the record." *Dunaway v. Dunaway*, 749 So. 2d 1112, 1121 (¶28) (Miss. Ct. App. 1999). However, in *Arthur*, the Supreme Court held that reversal was required even though the parties had presented "*no evidence* at trial as to what portion of the [retirement account] was accumulated prior to the marriage." *Arthur*, 691 So. 2d at 1004 (emphasis added). The Court emphasized that "retirement funds [that one spouse] accumulated prior to the parties'

---

[4] As noted above, Northwestern documents do show that Todd began accumulating ARP credits in 1988, eighteen years before he married Paula. Todd was 55 years old at the date of demarcation (58 when the final judgment was entered) and will begin receiving ARP payments at age 65. Dean Bell notes that when a defined benefit plan is equitably divided based on its present value at the time of the divorce, the "majority . . . approach" is to calculate "the marital fraction . . . by dividing the number of years of employment during the marriage by the total number of years of employment at the time of the divorce." Deborah H. Bell, *Bell on Mississippi Family Law* § 7.04[2][b], at 224 (3d ed. 2020). If a court orders a "deferred distribution" of a defined benefit plan, the "most common[]" way to calculate the marital fraction of the plan is to "divide[] years or months of employment service during the marriage by the total number of years or months to retirement." *Id.* §7.04[1][a], at 222; *see Sullivan v. Sullivan*, 302 So. 3d 1280, 1283-84 (¶¶11-12) (Miss. Ct. App. 2020) (discussing a "deferred distribution" of a defined benefit plan).

marriage are . . . *clearly* the type of assets . . . [that will] not be subject to equitable distribution upon divorce," and, therefore, the other spouse is not entitled to any part of those funds. *Id.* at 1003-04 (emphasis added). The Court apparently concluded that a spouse should not forfeit his separately earned retirement despite a failure to present evidence on the point at trial. *Id.*; *see also White v. White*, 868 So. 2d 1054, 1057 (¶7) (Miss. Ct. App. 2004) (holding that when there is evidence that a spouse's retirement plan is partly a marital asset and partly a separate asset, it is "error for the chancellor not to request [evidence on that issue] before equitably dividing the parties' assets"); *see also id.* at 1061 (¶23) (Irving, J., concurring) (emphasizing that "both parties bear responsibility" for presenting evidence on the issue). Accordingly, consistent with the Supreme Court's decision in *Arthur*, we reverse the chancellor's equitable division and remand for a determination of the separate and marital portions of Todd's ARP. *Arthur*, 691 So. 2d at 1004.

### III. Todd's Deferred Compensation Accounts, Commissions, and Life Insurance Policies

¶46. Next, Todd argues that the chancellor erred by ruling that the Antenuptial Agreement did not protect certain deferred compensation accounts, his vested gross commissions or "renewals," and the cash values of some of his life insurance policies.

### A. Deferred Compensation Accounts

¶47. Todd asserts that all four of his deferred compensation accounts were protected under the parties' Antenuptial Agreement. As stated above, the chancellor found that the 1999 FT account was Todd's separate property because it was accumulated prior to the marriage and protected under the Antenuptial Agreement as one of Todd's Separate Holdings. The

19

Agreement did not identify the account by number but, instead, as a "Long Term Deferral" with a value of $28,733.86 at the time of the marriage. By the demarcation date, that account had increased in value to $68,208.04 and remained fully Todd's separate property. Todd argues that the Agreement's reference to a "Long Term Deferral" protected not only the deferred compensation account in existence at the time of the marriage but also all deferred compensation accounts "as a class," including three separate accounts that he created *during the marriage*—2013 FT, 2015 FT, and 2020 FT.[5] Todd relies on language in the Agreement stating that Paula waived and was not entitled to "any interest in the income, increase, profits, dividends, or gains of whatever nature or kind, whether active or passive, arising from the corpus of [Todd's Separate Holdings] as of the date of the marriage."

¶48. The chancellor correctly concluded that Todd's argument is not persuasive. There is no evidence that the three new deferred compensation accounts created during the marriage represent "income" or "gains" of any kind "arising from the corpus" of the one and only deferred compensation account that existed on the date of the marriage. Rather, the evidence indicates that these were new deferred compensation accounts created as a result of Todd's efforts and income he earned *during the marriage*, which is quintessential marital property.[6]

---

[5] Todd testified that he believed the account numbers indicated the years in which they were created. Steinbrenner testified that was not "necessarily" the case. Regardless, all three accounts were created during the marriage.

[6] *See Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶20) (Miss. Ct. App. 2011) (stating that "any income or appreciation [that] resulted from either spouse's active efforts during the marriage" "becomes part of the marital estate"); *Flechas v. Flechas*, 791 So. 2d 295, 304 (¶29) (Miss. Ct. App. 2001) (stating that "marital property" "specifically includes all the salary earned by [a spouse] during the marriage").

The Agreement could have expressly stated what Todd now claims he "intended"—i.e., that all existing and future deferred compensation accounts would be protected "as a class" regardless of when they were created. But it did not. The Agreement only expressly protected the one "Long Term Deferral" in existence at the time of the marriage. Accordingly, this issue lacks merit.

### B. Vested Gross Commissions

¶49. Todd similarly contends that his earned commissions or "renewals" were protected under the Antenuptial Agreement. However, at trial, Todd acknowledged that the renewals listed in the Agreement in Todd's Separate Holdings had all been paid out and were not the same renewals that he had earned as of the demarcation date. Rather, the renewals valued as of the date of demarcation had all been earned *during the marriage*.

¶50. For reasons similar to those discussed just above, the chancellor did not err by concluding that renewals earned by Todd during the marriage were marital property and were not protected by the Antenuptial Agreement. The Agreement listed specific balances of vested and non-vested renewals in Todd's Separate Holdings. Those renewals were all paid out long before the demarcation date. The commissions that Todd earned during the marriage were not "income" or "gains" "arising from the corpus" of commissions that predated the marriage. Rather, they were new commissions that Todd earned on new policies that he sold *during the marriage*. Although Todd now claims that he "intended" to protect all of his commissions regardless of when he earned them, the terms of the Agreement do not cover commissions earned during the marriage. As the Mississippi Supreme Court has

stated, "[o]ur concern is not nearly so much with what the parties may have intended, but with what they said, since the words employed are by far the best resource for ascertaining the intent and assigning meaning with fairness and accuracy." *Royer Homes of Miss. Inc. v. Chandeleur Homes Inc.*, 857 So. 2d 748, 752 (¶10) (Miss. 2003). Accordingly, the chancellor did not err by concluding that renewals Todd had earned as of the demarcation date were marital property and were not covered by the parties' Antenuptial Agreement.

### C. Life Insurance Policies

¶51. Todd similarly argues that all twenty-one life insurance policies that he owned as of the demarcation date were protected by the Antenuptial Agreement even though he only owned eight of those policies at the time of the marriage. The 2006 Agreement simply lists "Insurance Cash Values" with a combined balance of $380,071.71 in Todd's Separate Holdings. Based on that provision, the chancellor held that the eight policies Todd owned at the time of the marriage were his separate property pursuant to the Antenuptial Agreement. However, Todd acquired thirteen additional policies *during the marriage*. He presented no evidence that he used separate funds to pay the premiums for any of those policies. Moreover, there is no evidence that these new policies, many of which he acquired years *after* he married Paula, represent "income" or other "gains" "arising from the corpus" of the distinct policies that he owned prior to the marriage. Again, the parties' Antenuptial Agreement does not expressly provide that any subsequently acquired insurance policies were protected as Separate Holdings. Accordingly, the chancellor did not err by ruling that the policies Todd acquired during the marriage were marital property and were not protected

22

by the parties' Antenuptial Agreement.

### IV.  *Ferguson* Factors

¶52.  Todd also argues that the chancellor erred "in not making findings of fact and conclusions of law under the *Ferguson* factors."  After classifying the parties' assets as separate or marital and "valuing the marital property, the court distributes [the marital property] using the factors laid out in *Ferguson*."  *Weaver v. Weaver*, 247 So. 3d 374, 376 (¶7) (Miss. Ct. App. 2018).  "A chancellor is required to make findings of fact regarding all applicable *Ferguson* factors."  *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).  In *Ferguson*, the Supreme Court identified the following factors that chancellors should consider in the equitable distribution of marital property:

1.   Substantial contribution to the accumulation of the property.  Factors to be considered in determining contribution are as follows:

   a.   Direct or indirect economic contribution to the acquisition of the property;

   b.   Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and

   c.   Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.

2.   The degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree, or otherwise.

3.   The market value and the emotional value of the assets subject to distribution.

4.   The value of assets not ordinarily, absent equitable factors to the

contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5.  Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6.  The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7.  The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8.  Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.

¶53. "[N]ot every case requires consideration of all eight of the [*Ferguson*] factors" because "the chancellor may consider only those factors he finds 'applicable' to the property in question." *Owen v. Owen*, 798 So. 2d 394, 399 (¶13) (Miss. 2001) (other quotation marks omitted). However, "[t]he failure to consider all applicable *Ferguson* factors is error and mandates reversal." *Lowrey*, 25 So. 3d at 286 (¶29). "*Ferguson* requires that the chancellor provide an explanation of his analysis of the evidence and basis for the decision." *Gray v. Gray*, 909 So. 2d 108, 111 (¶11) (Miss. Ct. App. 2005). Reversal is required if the appellate court cannot "evaluate the basis that [the chancellor] used to determine the division of property." *Sandlin v. Sandlin*, 699 So. 2d 1198, 1204 (Miss. 1997); *see also Ferguson*, 639 So. 2d at 928 (explaining that chancellors are required "to support their decisions with findings of fact and conclusions of law *for purposes of appellate review*" (emphasis added)). If "the record lacks sufficient *Ferguson* findings to allow for appellate review of the

24

chancellor's equitable division of marital property, we reverse and remand the chancellor's judgment." *Thornton v. Thornton*, 270 So. 3d 186, 193 (¶28) (Miss. Ct. App. 2018).

¶54. As sketched out briefly above, the parties gave vastly different accounts of the marriage and their respective contributions to it. Their testimony conflicted sharply on almost every aspect of their marriage. Given this conflict, the most important *Ferguson* factor in this case was probably the first: the parties' respective "contribution[s] to the accumulation of the [marital] property," including their "[d]irect or indirect economic contribution[s] to the acquisition of the property" and their "[c]ontribution[s] to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage." *Ferguson*, 639 So. 2d at 928. The chancellor discussed some of the sharply conflicting testimony relevant to this factor, but the chancellor made no findings regarding which party's testimony was more credible or whose version was closer to the truth. Nor did the chancellor assign any particular weight to this factor or explain how it impacted the division of the marital estate. Indeed, under this factor, the chancellor made no true findings of fact or conclusions of law but simply recounted some of the parties' conflicting testimony.

¶55. The chancellor's omission is significant because Paula made no direct contributions to the accumulation of marital property. And while "a homemaker's contribution is presumed to be equal to that of a wage-earner," *Lowrey*, 25 So. 3d at 287 (¶31) (citing *Hemsley*, 639 So. 2d at 915), this presumption must rest on evidence of the homemaker's "contribution to the economic and emotional well-being of the family unit." *Id.* (quoting

25

*Ferguson*, 639 So. 2d at 929). There must be "credible evidence that [the homemaker] contributed to the family's needs or to the stability and harmony of the marriage." *Id.* If the chancellor does "not provide any *findings of fact or conclusions of law* regarding this [factor]," we are unable to conduct meaningful "appellate review" in cases such as this one—where the party's respective contributions are in dispute, and the factor is critical to the *Ferguson* analysis. *Id.* at 287-88 (¶31) (emphasis added).

¶56. In the present case, Paula made no direct contributions to the accumulation of marital assets, and Todd testified that Paula spent wastefully, unreasonably refused to maintain employment, which was a constant source of strife during the marriage, and negatively impacted the stability and harmony of the marriage as a whole. In contrast, Paula testified that she did her best to support Todd and his career and quit her job only because "it was really important to Todd that [she] become a stay-at-home wife." If Paula's testimony is credible, then a 50/50 split of the marital estate is understandable. But if Todd's testimony is credible, then such a division is difficult to understand. The difficulty we have is that the chancellor made no findings of fact regarding this critical factor, nor did the chancellor's opinion explain how this factor impacted the division of the marital estate. For the reasons discussed above in Part II, we have already determined that we must reverse and remand the case for a new equitable division. On remand, the chancellor should make specific findings of fact and conclusions of law regarding the applicable *Ferguson* factors, especially the first *Ferguson* factor regarding the parties' respective contributions to the accumulation of marital property and the stability and harmony of the marriage.

## V.     Tax Consequences

¶57.     Todd also argues that the chancellor "erred in not providing for a fifty-fifty split of the tax consequences of the equitable distribution." The chancellor recognized that the marital estate included various assets "that could incur tax consequences and penalties after [her] ruling," and the chancellor ruled that "the parties shall split equally (50/50) the costs, fees, penalties and/or taxes, if any, associated with the [court-ordered] transfer of . . . funds to Paula." However, Todd insists that the chancellor "never provided the parties a means to divide the tax consequences associated with her ruling" and that the "monetary award to Paula did not take into consideration the tax consequences associated with [the] ruling." As such, Todd argues the judgment must be reversed.

¶58.     In his post-trial proposed findings of fact and conclusions of law, Todd acknowledged that "[t]here was no testimony concerning any tax implications of this divorce, except that [he] would have to pay taxes on certain accounts if they were liquidated." Nonetheless, the chancellor's opinion acknowledged the reality of potential tax consequences and ordered that any costs, fees, penalties, or taxes resulting from court-ordered payments to Paula should be split equally. At the hearing on Todd's motion for reconsideration, the chancellor stated it was "not the duty of the [c]ourt" to go beyond her ruling and give "guidance on the method by which the judgment is satisfied." During oral argument in this Court, Paula's attorney was asked what would occur if Todd incurred tax penalties because he had to liquidate assets in order to make court-ordered payments to Paula—i.e., whether Paula would bear those penalties equally. Counsel answered, "That's what [the chancellor] said. . . . Yes."

27

¶59. We conclude that the chancellor did not err by ordering the parties to bear equally any tax consequences that result from her ruling. The chancellor simply addressed the issue as best she could given that the parties presented no evidence at trial regarding any specific tax consequences. The chancellor may, in her discretion, permit testimony on this issue on remand. We also note that any possible tax consequences could be mitigated by equitably dividing the marital estate through a more extended schedule of lump-sum alimony. *See Davenport v. Davenport*, 156 So. 3d 231, 241 (¶34) (Miss. 2014) (noting that "lump-sum alimony [may be] awarded as a mechanism to equitably divide the marital assets").

## CONCLUSION

¶60. We find no error in the chancellor's interpretation or application of the parties' Antenuptial Agreement. However, the chancellor erred by not classifying the portion of Todd's ARP that he accumulated prior to the marriage as Todd's separate asset. *Arthur*, 691 So. 2d at 1003-04. "There having been no evidence at trial as to what portion of the [ARP] was accumulated prior to the marriage, we reverse this award and remand for a determination thereof." *Id.* In addition, the chancellor erred by making insufficient findings of fact and conclusions of law regarding the *Ferguson* factors, especially regarding the parties' respective contributions to the accumulation of marital property and the stability and harmony of the marriage. Therefore, we reverse the chancery court's order and remand for further proceedings consistent with this opinion.

¶61. **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. CARLTON, P.J., AND LASSITTER**

28

**ST. PÉ, J., NOT PARTICIPATING.**